No. 103,310

GILBERT H. COULTER and ELIZABETH S. LEIGHNOR, Individually and as Representative Plaintiffs on Behalf of Persons or Companies Similarly Situated, *Plaintiffs/Appellees*, v. ANADARKO PETROLEUM CORPORATION, *Defendant/Appellee*, v. STAN R. BOLES, on Behalf of Himself and All Similarly Situated Royalty Owners, *Appellants*.

(292 P.3d 289)

Opinion filed January 11, 2013.

*Rex A. Sharp*, of Gunderson, Sharp & Walke L.L.P, of Prairie Village, argued the cause, and *Barbara C. Frankland* and *David E. Sharp*, of the same firm, were with him on the briefs for appellants.

*David G. Seely*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, argued the cause, and *Thomas D. Kitch, Gregory J. Stucky*, and *Daniel E. Lawrence*, of the same firm, and *Erick E. Nordling*, of Kramer, Nordling & Nordling, LLC, of Hugoton, were with him on the brief for plaintiffs/appellees.

*Guy S. Lipe*, of Vinson & Elkins, LLP, of Houston, Texas, argued the cause, and *Daniel H. Diepenbrock*, of Law Office of Daniel H. Diepenbrock, P.A., of Liberal, was with him on the brief for defendant/appellee.

The opinion of the court was delivered by

JOHNSON, J.: Royalty owners entitled to receive a share of the production of natural gas in the Hugoton gas field in southwest Kansas brought a class action against Anadarko Petroleum Corporation (APC) claiming that the company and its affiliates had effected an underpayment of the royalties required by the plaintiffs' respective oil and gas leases. The original petition, filed in 1998, sought an accounting, damages, and declaratory and injunctive relief. The case was tried to the bench in 2002, reargued to the same trial judge in 2006, and settled in June 2009. Stan Boles, one of the more than 6,000 members of the settlement class, objected to the amended class certification and the class action settlement agreement negotiated by Timothy Coulter, as representative of the plaintiff class. Despite Boles' objection, the district court approved the settlement, finding it to be bona fide, fair, just, reasonable, and adequate. Boles appeals the district court's approval of the settlement, while the plaintiff class and the defendant urge us to affirm the district court's approval of the settlement. Finding that the district court did not abuse its discretion in assessing the adequacy of class representation or the character of the settlement agreement, we affirm its rulings.

## FACTUAL AND PROCEDURAL OVERVIEW

APC's brief relates a brief history of the development of what it refers to as the Kansas Hugoton Gas Field (Hugoton Field), along with a description of the evolution of the defendant company and its affiliates. APC recites that the Hugoton Field was discovered in

the 1920s and first developed in the 1930s by several companies, including Panhandle Eastern Pipe Line Company (PEPL). PEPL drilled wells, laid a gathering system west of Hugoton, Kansas, built a transmission line eastward connecting the system to the Liberal compressor station, and built an interstate transmission line further connecting the Hugoton Field to distant eastern markets. PEPL subsequently formed Anadarko Production Company, which in turn eventually formed APC as a wholly-owned subsidiary for the exploration, production, and development of operations in the Hugoton Field, and elsewhere. APC formed Anadarko Gathering Company (AGC), which now operates the Hugoton Gathering System, consisting of approximately 1,650 miles of pipeline utilized to gather and transport natural gas from thousands of wells. APC sells most of its production from southwest Kansas to another affiliated company, Anadarko Energy Services Company (AESC).

The point at which the raw natural gas comes to the surface and leaves the well is referred to as the wellhead. Oil and gas leases ordinarily provide for the payment of royalties at the wellhead. But the gas is subjected to processing at certain points between the wellhead at the front end and the interstate transmission pipeline at the tail end, where the principal market for gas from the Hugoton Field exists. Highly summarized and simplified, the gas is initially subjected to some processing at the well site, *e.g.* separation, dehydration, and compression, before it enters the gathering system. In the gathering system, the gas stream is further treated and must be compressed at various locations to push the gas towards a processing plant. In the process, the gas cools and forms condensate, some of which is lost or removed. Further, some of the gas stream is used as fuel for the compressors in the gathering system operations. Then, the gas enters processing plants where natural gas liquids (NGLs), helium, and other non-hydrocarbons such as nitrogen are removed from the gas stream before the residue is compressed again for entry into the interstate pipeline. Federally regulated tariffs govern the condition of the gas that is allowed into interstate pipelines. Some of the by-products removed at the processing plants, such as helium, are sold separately.

At the time of this lawsuit, AESC paid APC for the gas based on a formula tied to a published index price applicable to gas being sold at the inlet to the PEPL interstate transmission pipeline. The formula related the downstream price back to the wellhead by subtracting AESC's gathering and fuel costs pursuant to its contracts with AGC and others. But the net price was applied to the full wellhead MMBtu (one million British thermal units) content of the gas stream so as to capture the heating value of NGLs and condensate which had been part of the wellhead gas stream but which were removed before the gas entered the interstate pipeline. As noted, some of those removed components were sold separately in downstream markets.

The oil and gas leases required APC to pay royalties on the gas produced at the well site. Accordingly, APC paid royalties on the same basis as it was paid by its affiliates, meaning that the royalties were calculated using the market-based index price at the interstate pipeline inlet, less the gathering and fuel costs necessary to move the gas from the well sites to the interstate pipeline index point. Given that the royalties were paid based upon the heating value of the entire gas stream at the wellhead (which would include the commingled NGLs, etc.), no separate royalties were paid on the sales of NGLs or other components of the gas stream after their removal or extraction, except for helium. Correspondingly, APC also did not charge royalty owners with any of the costs associated with removing or extracting the NGLs from the gas stream at the processing plants. But APC did pay royalties on the net sales of helium, meaning that royalty owners shared in the costs associated with extracting the helium from the gas stream.

In 1998, plaintiffs, all of whom were or had been owners of mineral interests in lands leased by APC, filed a petition challenging the manner in which APC was paying royalties on natural gas production under the respective oil and gas leases. The plaintiffs principally complained that APC had wrongfully allocated production and marketing costs against the royalty payments in contravention of its contractual obligation to produce gas at its own expense. The original petition included the following allegations:

"J. With respect to production of the effluent stream from lands subject to the aforementioned leases, defendant has failed to properly and fully account for royalty payments due to members of plaintiff class in accordance with the express and implied covenants of their leases, by wrongfully allocating production costs and the cost of placing gas in a marketable condition ('marketing costs') so as to reduce such royalty payments to which members of plaintiff class are entitled or by unilaterally selecting an improper lower price on which royalty payments are calculated.

. . . .

"L. By its conduct, defendant has unjustly enriched itself and breached its duties and obligations (both express and implied) arising under the aforementioned leases, including but not limited to the following:

(a) By means of its allocation of costs (such as gathering, compression, and fuel) associated with the production of the effluent stream, and/or by means of non-arms-length sales to an affiliated entity, defendant has wrongfully reduced royalty payments to members of the plaintiff class, and has thereby breached its duty to produce gas at its own expense;

(b) By means of its allocation of costs associated with placing the effluent stream in a marketable condition, and/or by means of non-arms-length sales to an affiliated entity, defendant has wrongfully reduced royalty payments to members of the plaintiff class, and has thereby breached its duty to place gas in a marketable condition at its own expense;

(c) By so reducing royalty payments to members of the plaintiff class, and by failing to disclose such reductions in remittance statements, defendant has breached its duty of good faith and fair dealing when accounting to members of the plaintiff class."

The relief sought in the original petition included the following:

"WHEREFORE, plaintiffs, . . . pray:

"1. For the judgment of this court declaring that defendant is prohibited from allocating production and marketing costs so as to reduce such royalty payments to which members of plaintiff class are entitled or from unilaterally selecting an improperly lower price on which royalty payments are calculated; and for an order (i) permanently prohibiting defendant from calculating royalty payments in such a manner or in any other manner contrary to its duties under Kansas law, and (ii) requiring defendant to henceforth calculate and make royalty payments in accordance with such duties.

"2. For a full and complete accounting by defendant of: (a) all the consideration defendant and any related entity has received in connection with the sale or other disposition of the effluent stream (or any portion thereof) extracted from the lands subject to the leases described above; and (b) complete disclosure of all reductions in royalty payments due to charges and expenses, if any, allegedly incurred by it or by any related entity before the disposition of such effluent stream, and the

purpose of each such reduction; and (c) the manner in which all royalty payments in connection with any such disposition have been calculated; and

"3. For judgment of damages and prejudgment interest, for underpayment of royalty resulting from improper reductions and/or the use of other than arms-length pricing . . . ."

Subsequently, APC filed notice of removal to the United States District Court for the District of Kansas, but plaintiffs' motion to remand the action to state court was granted, based upon a lack of federal court subject matter jurisdiction. Upon remand and further discovery, the Stevens County District Court certified the class on August 23, 2000. The certified class, which at the time consisted of approximately 4,500 members, was described as:

"All persons or concerns owning mineral interests in lands located in the areal confines of the Kansas Hugoton Field, burdened by oil and gas leases owned in whole or in part by [APC] insofar as such leases are productive of gas from above the base of the Panoma Council Grove Field, production from which has been collected in one or more gathering systems operated by [AGC] . . . ."

On November 20, 2001, the district court denied both parties' motions for summary judgment, and the matter proceeded to a bench trial in February 2002. The pretrial order identified the following relevant issues of fact and law to be decided in the trial:

"11. ISSUES OF FACT

"a. Whether Plaintiffs' royalties are being reduced by expenses incurred to compress the gas in issue.

"b. If Plaintiffs' royalties are being reduced by expenses incurred to compress the gas, what is the purpose for compressing the gas in issue?

"c. Whether Plaintiffs' royalties are being reduced by expenses incurred to dehydrate the gas in issue.

"d. If Plaintiffs' royalties are being reduced by expenses incurred to dehydrate the gas, what is the purpose for dehydrating the gas in issue?

"e. Whether Plaintiffs' royalties are being reduced by expenses incurred to 'gather' or 'transport' the gas in issue.

"f. If Plaintiffs' royalties are being reduced by expenses incurred to 'gather' or 'transport' the gas in issue, whether those expenses are properly categorized as 'gathering' or 'transportation', as those terms are defined by Kansas law.

"g. Whether any or all of the expenses referred to in paragraphs a through f are 'production' expenses, as Kansas law defines that term.

"h. Whether the facilities between the wells in issue and the interstate transmission pipeline are being used either to 'produce' the gas in issue in this case or to place that gas in marketable condition.

"i. Whether liquid hydrocarbons are being extracted from the gas in issue and, if so, if that extraction is done for purposes of making the gas in issue marketable?

"j. Whether any or all of the expenses referred to in paragraphs a through f and i, above, are 'marketable' expenses, as Kansas law defines that term.

"k. Whether the gas in issue is 'marketable' at the well.

. . . .

"12. ISSUES OF LAW

"a. Whether the compression costs at issue in the instant case may, under Kansas law, be deducted prior to calculating and paying royalty under the express and implied terms of the subject oil and gas leases and the facts of this case.

"b. Whether the dehydration costs at issue in the instant case may, under Kansas law, be deducted prior to calculating and paying royalty under the express and implied terms of the subject oil and gas leases and the facts of this case.

"c. Whether the gathering costs at issue in the instant case may, under Kansas law, be deducted prior to calculating and paying royalty under the express and implied terms of the subject oil and gas leases and the facts of this case.

"d. Whether the transportation costs at issue in the instant case may, under Kansas law, be deducted prior to calculating the paying royalty under the express and implied terms of the subject oil and gas leases and the facts of this case.

"e. How Kansas law defines 'production' expenses and whether such definition includes the expenses necessary to place the gas in marketable condition.

"f. How Kansas law defines 'gathering' and 'transportation' in the context of the facts of this case.

"g. How Kansas law defines the implied duty to market gas in the context of the facts of this case.

"h. How Kansas law defines 'marketable' in the context of the facts of this case."

The plaintiff class points out that, prior to the bench trial, the district court ruled against the plaintiff class on two issues which the class identifies as being "key legal issues." First, the district court refused to find that, as a matter of Kansas law, a lessee is always prohibited from deducting compression expenses, including fuel, from a royalty owner's share. Those expenses comprised the bulk of plaintiffs' gathering deduction claims (gathering claims). Instead, the trial court ruled that the deductibility of these expenses turned on the factual determination of the purpose for which the costs were incurred, *i.e.*, whether the costs were necessary to put the gas in marketable condition. In the second ruling, the district court found that the plaintiff class had not met the threshold test for asserting a claim for punitive damages based

upon the class' allegation that APC used affiliates to hide that it was underpaying royalties.

At the bench trial, the parties presented conflicting expert testimony and documentary evidence on the critical question of the point at which APC had produced gas in marketable condition. The plaintiff class presented evidence to support its contention that the gas was not in marketable condition until it met the federal specifications to be transported in the interstate pipeline, which was after the processing plants had extracted the NGLs and non-hydrocarbons and the remaining gas stream had been highly compressed. APC presented evidence to support its assertion that the raw natural gas was in marketable condition at the well site, before it even entered the gathering system.

After the bench trial, the parties submitted proposed findings of fact and conclusions of law, and the court heard argument on those proposals on May 10, 2002. After the matter had been pending for a number of years, the plaintiffs moved for re-argument. The district court granted the motion and held a rehearing on August 9, 2006. When a ruling had not been rendered by September 2007, the parties sought recusal of the trial judge, albeit no ruling on that motion appears in the record.

Shortly thereafter, the parties engaged in an unsuccessful mediation. Later in 2008, the parties resumed settlement negotiations. APC took the position that any settlement agreement had to cover all aspects of its royalty responsibilities in Kansas, including both hydrocarbons and non-hydrocarbons. In return, APC was willing to make a series of "representations" upon which plaintiffs' counsel could rely in evaluating whether a settlement offer would be fair and adequate for the class members. Included in those representations were: (1) an averment that APC has always paid royalties on the total heating value of the gas stream as it leaves the wellhead, *i.e.*, the full MMBtu wellhead volume; (2) an assurance that APC's royalty calculation makes no deduction or adjustment for processing when determining the price to be applied to the wellhead MMBtu; (3) an estimation of the additional net value of the NGLs when they are extracted and sold at the processing plant over and above their MMBtu value as part of the gas stream at the wellhead,

*i.e.,* an estimate of the net uplift as a percentage of the market index price; (4) an explanation of the contract terms between APC's affiliate and the National Helium Plant regarding the pricing or the taking in kind of the extracted liquids; (5) an explanation of how APC pays royalties on helium; (6) an agreement that APC accepts the estimate that net revenues realized from the sale of gas at Kansas pooling points reflect an increase of 1% of the index price; and (7) a submission of a spreadsheet setting forth APC's best estimate of the gathering and fuel costs that plaintiff class was seeking to recoup in the lawsuit.

Those continuing negotiations eventually culminated in the subject agreement. A motion was filed with the district court, requesting the certification of an expanded class and the conditional approval of the settlement. The proposal expanded the size of the class to over 6,000 members by enlarging the geographical and geological boundaries of the included wells. The new class was defined as:

"[A]ll Persons owning mineral interests that are or were burdened by oil and gas leases owned or operated in whole or in part by APC covering property located in Kansas, and that were royalty owners of APC on production for any production month prior to January 1, 2009, to the extent that such production was sold by APC to any Affiliate of APC . . . ."

The key terms of the settlement included the following: (1) APC's payment of $33 million in damages for the alleged past underpayment of royalties; (2) the plaintiffs' release of all claims arising out of or relating to the payment or calculation of royalties on APC's working interest share of gas, including both hydrocarbon and non-hydrocarbon components, such as helium; (3) going forward provisions dictating how APC would calculate and pay future royalties on both hydrocarbon and non-hydrocarbon components of the gas stream; (4) a provision that APC's royalty check stubs or supplemental documentation would include information on the components of the agreed-upon royalty calculation methodology on gas as well as information on the volumes and net proceeds received on helium and other non-hydrocarbon components of the gas stream; and (5) a provision that any future discrepancy or dispute about the calculation or payment of royalties under the set-

tlement methodology or the adequacy of the disclosure of information required by the settlement agreement that could not be resolved informally would be submitted to binding arbitration under the Commercial Arbitration Rules of the American Arbitration Association.

The district court preliminarily approved the settlement, directed that notice be given to the class members, and set a fairness hearing for September 15, 2009. Appellant Boles was the only class member to file an objection to the settlement agreement, and he also filed a motion to intervene in the proceedings and to conduct further discovery.

At the fairness hearing, Boles challenged the amended class certification based upon an alleged inadequacy of class representation. Boles asserted that class counsel had inadequately represented the class members by failing to investigate and place a value on all of the claims which were to be released by the settlement. Specifically, Boles complained about counsel's failure to investigate and litigate the estimated value of the claims which he referred to as "non-gathering claims" or "non-gathering deduction claims."

Those non-gathering claims, which also figure prominently in Boles' challenge to the settlement approval, refer to the claimed reduction in royalties attributable to downstream events other than the gathering and fuel costs incurred in the gathering system. Examples of the non-gathering claims are the failure of APC to account for the sale or loss of condensate during transmission, APC's deduction of a proportionate amount of the cost to extract helium when paying helium royalties, the failure to extract and sell nitrogen, and the failure to pay royalties on the gross NGLs uplift, which is the difference between the gross sale price of the NGLs extracted from the gas stream at the processing plants (without deduction for processing, conditioning, or transportation costs) and the MMBtu (heating) value of the NGLs as a component of the gas stream at the wellhead.

As noted, Boles' objection to the terms of the settlement agreement also centered upon his purported non-gathering claims. He claimed that the settlement released those claims "without thorough factual development through discovery, without expert anal-

ysis, without legal analysis presented to the Court, without valuation, and without any such information provided to the Class in the Class Notice, and it modifies almost every known right, express and implied, of a royalty owner in the lease." The district court permitted Boles to present an expert witness, Daniel Reineke, to testify regarding the valuation of the non-gathering claims. Boles' counsel had previously used Reineke to testify in an Oklahoma case that challenged APC's royalty payments, and the witness used his familiarity with APC's royalty payment practices in Oklahoma to inform his opinion of the value of the non-gathering claims in this case. Both the class representative and APC objected to Reineke's testimony because it was not based upon any experience with or knowledge of Kansas law. Nevertheless, the district court ultimately allowed Reineke's testimony, albeit it would later find that the expert's valuation testimony was "unrealistic."

Reineke opined that the non-gathering claims in this case should have been valued at approximately $109 million, which the district court described as follows in its journal entry:

"[Boles' claim is] that the . . . settlement will result in an underpayment of helium extraction in excess of five million dollars ($5,000,000.00) and a loss of twenty-four million dollars ($24,000,000.00) for natural gas liquids uplift (increased value) and a loss of condensate revenue of almost seven million dollars ($7,000,000.00) and a deficiency due to affiliate pricing of nine million dollars ($9,000,000.00) and a loss of interest of ten percent (10%) of sixty-four million dollars ($64,000,000.00)."

Additionally, Boles contended that the settlement also undervalued the gathering claims that the class had fully litigated at the bench trial. He suggested that those claims were actually worth more than $40 million dollars, rather than the $33 million agreed upon by the parties. Therefore, in Boles' view, the overall settlement should have required APC to pay in the neighborhood of $149 million for both the gathering and non-gathering claims.

To supplement the expert testimony of Reineke, Boles' attorney was allowed to submit thousands of pages of discovery documents pertaining to the valuation of non-gathering claims which had been obtained in conjunction with a separate case filed by Boles against APC in federal court. However, the district court refused to allow

Boles to present the expert testimony of Alan DeVore, an oil and gas attorney who had been involved with the Oklahoma royalty case. The refusal was based upon Boles' failure to lay an adequate foundation to establish DeVore as an expert with respect to royalty issues in Kansas.

On September 17, 2009, the district court issued its rulings, which certified the new class, denied Boles' motions for discovery and intervention, and approved the settlement agreement between the class and APC. In its journal entry, the court noted that, despite the settlement agreement, APC continued to deny that it was legally liable for the "gathering claims" and that APC had asserted many defenses to those litigated claims.

From the plaintiffs' perspective on the gathering claims, the court acknowledged that it need not and should not decide the merits of the controversy, but that the court had observed "that there exist serious questions of law and fact which place the ultimate outcome of this litigation in doubt." The court noted that there might be a possibility that the settlement class could obtain judgment for more than the settlement amount, but that "it is also possible that there would be no recovery," *i.e.*, the class members could get nothing if they waited on the court's ruling on the gathering claims.

The court further observed that the settlement "was arrived at through arms-length and vigorous and extensive negotiations between Class Counsel and counsel for APC"; that the settlement was reached "in good faith"; and that it was "based on a realistic appraisal by the parties and their counsel of the difficulties inherent in a case of this magnitude and complexity." Based upon its findings, the court found the settlement "to be bona fide, fair, just, reasonable and adequate."

The district court's journal entry then proceeded to analyze the settlement as it related to Boles' postsettlement objections. The court first summarily rejected the adequacy-of-counsel challenge to class certification, finding class counsel to be "preeminent in the field of royalty owner litigation against oil and gas companies," having served as class counsel for royalty owners in several states. The court suggested that a difference of opinion among learned

counsel about the efficacy of a particular issue or claim—here, the viability of the purported non-gathering claims—does not render one of them inadequate or unworthy to represent a class.

Then, the court, after noting that it "well understands, and is knowledgeable of the underlying facts that were litigated between the Plaintiff Class and Anadarko," addressed Boles' breakdown of the monetary value of the alleged non-gathering claims. Starting with Boles' complaint that royalties were deficient because APC sold gas at the wellhead to its affiliate, AESC, the court said that it had found no evidence to indicate that such a wellhead sale was improper or detrimental to the royalty owners.

Next, the court noted that nearly half of the $109 million in non-gathering claims—$64 million—was based on the notion that the class would collect 10% interest on its claims against APC. The court suggested that such a speculative claim for prejudgment interest was legally suspect, at best.

Next, the court found that the $6 million claim for "condensate lost and not paid for, has little merit in this Court's mind." The court noted that "[j]ust because the condensate can often drop out in the gathering line, and/or at collection points, does not mean it is a product that is sellable at that point without further refinement," and there was no evidence as to what the costs would be to capture this condensate and make it a marketable product.

Addressing Boles' claim that plaintiffs' loss should include an additional $24 million "for natural gas liquids uplift (increased value)," the court noted that it was based on the premise that royalty owners should receive their percentage share of extracted NGLs without having to share in the cost to process and extract those NGLs from the natural gas stream. The court found no precedent in Kansas for requiring the producer to pay royalties on the full uplift or full value of NGLs, while bearing the entire expense of processing or refining the gas stream to obtain the NGLs. Likewise, with regard to the $5 million claimed underpayment of royalties for the helium extraction, the court opined that "there simply is no precedent case law in Kansas that says a producer is required to collect and pay for helium for its full value without a deduction of processing costs or to pay for helium at an increased cost other

than the true value of the product after it has been [processed]." Further, the court could find no legal support for Boles' claim that a natural gas producer is required by an oil and gas lease to collect and gather nitrogen from the gas stream.

Ultimately, the district court simply rejected Boles' claim that the lawsuit was worth $149 million. Whereupon, the court declared that it had "analyzed and examined the settlement" agreement, and believed it to be "fair, just, adequate, and reasonable," based in part "upon the future savings and future income to the royalty owners, along with their proposed payout of $33,000,000." Boles filed a timely appeal, and the case was transferred to this court on its own motion. See K.S.A. 20-3018(c).

Boles' brief presented the issues on appeal as follows:

"1. Does Kansas law or due process allow the settlement of factually unlitigated and unvalued claims in a class action?

"2. Can future disputes be settled in a class action by rewriting leases, by waiving or amending the Kansas law, or by requiring mandatory arbitration so that there will be no right to a jury trial, no right to a court proceeding, and no right to a class action—or all of the above?

"3. Can a class action settlement be approved without a rigorous analysis of the class certification facts and of the class settlement factors?"

In contrast, APC characterizes the issues presented as being two-fold: Whether Boles' failure to challenge the district court's approval of the settlement on the basis of an abuse of discretion requires an affirmance because of our standard of review, and whether the district court abused its discretion in approving the class action settlement. The class' brief also describes two issues to be decided: Whether the trial court abused its discretion when it found that the attorneys for the class were "adequate" to represent the class of natural gas royalty owners under K.S.A. 60-223(a)(4), and whether the trial court abused its discretion when it approved the class action settlement agreement. We believe that the class' simple recitation of the issues captures the gravamen of the case. The ultimate question to be decided here is whether the district court committed reversible error when it approved the settlement agreement between the defendant and the amended class. We will proceed on the simplified statement of the issues.

PRESERVATION OF CHALLENGE TO THE SETTLEMENT APPROVAL

First, we will briefly address APC's claim that we cannot reverse the district court's approval of the settlement agreement because Boles has failed to adequately brief the issue. See, *e.g.*, *Cooke v. Gillespie*, 285 Kan. 748, 758, 176 P.3d 144 (2008) (point raised incidentally but not argued in brief deemed abandoned). That argument begins by asserting that the standard of appellate review of a district court judgment approving a class action settlement is whether the trial court abused its discretion. See, *e.g.*, *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1189, 1186 (10th Cir. 2002) (reviewing district court's approval of settlement agreement for abuse of discretion). APC then points out that Boles' brief only makes two references to the phrase "abuse of discretion," and that rather than challenging the district court's ruling as an abuse of discretion, Boles chose to present purely legal arguments. He suggests that those legal arguments are insufficient to carry the burden an appellant bears to establish an abuse of discretion.

APC apparently overlooked that this court has clarified the relationship between legal arguments and the abuse of discretion standard of review. An abuse of discretion standard does not mean that a mistake of law cannot be corrected by an appellate court. Rather, a district court necessarily abuses its discretion when it makes an error of law. Under the abuse of discretion standard, an appellate court reviews whether the district court's discretion was guided by erroneous legal conclusions. See *State v. Moore*, 287 Kan. 121, 135, 194 P.3d 18 (2008).

That concept also applies to civil cases in general and class action certification cases in particular. For instance, in *Dragon v. Vanguard Industries*, 282 Kan. 349, 354, 144 P.3d 1279 (2006) (*Dragon II*) (quoting *Dragon v. Vanguard Industries, Inc.*, 277 Kan. 776, 779, 89 P.3d 908 [2004] [*Dragon I*]), a class certification case, we declared that " ' "[a]buse is found when the trial court has gone outside the framework of legal standards or statutory limitations, or when it fails to properly consider the factors on that issue given by the higher courts to guide the discretionary determination." ' "

Accordingly, Boles' legal arguments challenging the propriety of a class action settlement of the "unlitigated non-gathering claims"

and questioning the court's authority to approve such a settlement without further investigation and findings are sufficient to preserve and place before this court the issue of whether the district court abused its discretion in approving the settlement.

## CERTIFICATION OF AMENDED CLASS

The overarching theme of Boles' challenge to the class action settlement agreement is that it essentially gave away the class members' non-gathering claims without the efficacy and potential value of those claims being litigated. He relates that complaint to the class certification challenge by arguing that the relevant factors, especially the adequacy of representation factor, cannot be met when class counsel chose not to fully litigate the non-gathering claims.

### Standard of Review

We afford trial courts substantial discretion in determining whether a class should be certified, *i.e.*, review of class certification is subject to an abuse of discretion standard. Generally, when a discretionary decision is made within the legal standards and takes the proper factors into account in the proper way, the decision is protected even if the reviewing court might think it unwise. But to be entitled to the full measure of deference when certifying a class, the district court must apply the provisions of K.S.A. 60-223. See *Dragon II*, 282 Kan. at 354.

### Analysis

K.S.A. 60-223(a) establishes four factors that must be met before a class is certified: "(1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation." *Dragon I*, 277 Kan. at 778. As noted, Boles focuses his attention on the last factor, the adequacy of representation. In his view, that factor should be defined as "the willingness and tenacity to litigate a factual claim and [ensure] due process." But, of course, the need to tenaciously litigate a fact only arises when that fact is relevant to a reasonably valid legal claim.

Boles first contends that, in the context of a settlement, the court is required to give heightened attention and apply rigorous analysis

to the factors because class certification is not being contested by the parties. He claims the district court did not perform that function in this case. Boles' argument might be more persuasive if the parties had not already gone through the adversarial litigation process in the original class certification. The judge ruling on the certification of the amended class had presided over the original certification process and journalized that he was incorporating by reference his prior findings on class certification. The trial judge expressly stated that he was relying on the same reasons that had supported certification of the original class for trial. In other words, the factors pertinent to the certification of the amended class had been submitted to adversarial testing when the original class was certified.

Moreover, the certification at issue here is for an amended class that simply enlarged the geographical and geological boundaries so APC could resolve the claims on all of its Kansas working interests in this one lawsuit. The amendment had nothing to do with the distinction between "gathering claims" and "non-gathering claims," and Boles does not explain how the expanded class had any effect on his primary complaint about the settlement of non-gathering claims for either the original or the expanded class members. To the contrary, Boles appears to be using the class certification challenge as a vehicle to attack the amount of settlement on behalf of the other class members, even though the others declined to object on their own. Although Boles has, at times, purported to act on behalf of all similarly situated royalty owners, he is not a class representative in this action and should not be permitted to simply impose his will on the entire class.

Nevertheless, we will proceed to consider the adequacy of class counsel from the viewpoint of a class member who did not actively participate in the proceedings. Starting with the statutory provisions, K.S.A. 60-223 did not contain any factors to be considered in determining the adequacy of class counsel when this matter was settled. However, there was a federal provision, Fed. R. Civ. Proc. 23, which provided in relevant part:

"(g) Class Counsel.

"(1) *Appointing Class Counsel.* Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the court:
    (A) must consider:
    (i) the work counsel has done in identifying or investigating potential claims in the action;
    (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
    (iii) counsel's knowledge of the applicable law; and
    (iv) the resources that counsel will commit to representing the class;
    (B) may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;
    (C) may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs . . . ."

In 2010, the legislature passed House Bill 2656, which amended K.S.A. 60-223 to add such language governing the adequacy of counsel determination. L. 2010, ch. 135, sec. 90. While the amended version of K.S.A. 60-223 is not binding authority in this case, it gives some framework for analyzing Boles' argument that class counsel was inadequate.

Boles does not seriously challenge most of the federal factors, such as class counsel's experience in handling this type of class action, counsel's knowledge of the applicable law, or counsel's willingness to commit resources to representing the class. Rather, he specifically concedes that the class attorneys are "clearly adequate if they choose to be so." Instead, Boles' adequacy complaint relies on the first factor in subsection (g)(1)(A)(i) of federal Rule 23, which considers "the work counsel has done in identifying or investigating potential claims in the action." Boles claims that the class counsel in this lawsuit failed to adequately identify and investigate the potential non-gathering claims.

To the extent Boles intimates that class counsel simply failed to uncover the facts which would permit an identification of the potential non-gathering claims, the record suggests otherwise. There was considerable discovery conducted on what happened to the natural gas stream between the wellhead and the interstate pipeline, including the processing and disposition of by-products, such as condensate, helium, and NGLs. Indeed, the class' brief contends

that it was the information gleaned from that discovery which led to its conclusion that the non-gathering claims were of no real value, and that it was strategically preferable to limit the trial to its gathering claims.

To the extent Boles suggests that class counsel failed to recognize the legal significance of the non-gathering claims when it agreed to the settlement, we need only look at our own case files. The same attorneys that represented the class in this lawsuit were involved in the appeal of *Littell v. Oxy U.S.A., Inc.*, No. 100,349 (voluntary dismissal January 22, 2009), which was argued before us in December 2008, some 6 months before the settlement in this case. Boles' appellate attorney in this case was also involved in the *Littell* appeal, representing an intervenor/objector in a class action scenario that was strikingly similar to the case at hand. Although that case was voluntarily dismissed by the objector/intervenor shortly after oral argument, the arguments about non-gathering claims in this case are an echo of the arguments propounded in *Littell*. Accordingly, class counsel here would have been well aware that the settlement in this case could be subject to attack by an objector/intervenor on the same non-gathering claims basis as in *Littell*.

Additionally, one of the class attorneys, who had also been involved in several other similar Hugoton Field royalty cases, testified at the fairness hearing in this case. The attorney shared his opinion that the only meritorious claims were the asserted gathering claims and explained why the class representative had agreed to include the non-gathering claims in the settlement: ·

"[D]uring the negotiations, [APC] advised us that any settlement would require a complete release of all claims that could have been asserted on behalf of the class in connection with its calculation and payment of royalties. *Although we did not believe that any of the ancillary claims had merit*, we knew that . . . [APC] would ascribe some value to having them released, so we attempted to use that as leverage in the negotiations." (Emphasis added.)

The class attorney opined that the release of the non-gathering claims enabled the class to get a better settlement on the gathering claims than it would have otherwise, specifically stating that "if those [non-gathering] claims had not been included in the release,

I seriously doubt that we would have gotten [APC] above 83 or 84 percent of the total deductions."

Discovery in this action was extensive, spanning at least 2 years. Class counsel expended considerable work in identifying and investigating potential claims in this action. As a result of that effort, class counsel determined that the ancillary claims, including the non-gathering claims which occurred principally downstream from the gathering claims, had no merit. That assessment was consistent with the trial court's review of the non-gathering claims. Indeed, the district court also observed that it was a distinct possibility that the class might well recover nothing from the gathering claims, much less get any recovery from the downstream claims. *Boles* suggests that class counsel is inadequate for failing to independently determine the precise value of a hypothetical claim that counsel believes to be without merit and unrecoverable at trial. That cannot be the law.

Accordingly, we agree with the district court's finding that class counsel adequately represented the class members, and we affirm the district court's certification of the amended class.

## Approval of Settlement

Boles' attack on the certification of the amended class was intertwined with his other challenges to the settlement agreement, which we will consider as subparts under the overarching issue of whether the district court erred in approving the settlement agreement between APC and the plaintiff class.

### Standard of Review/Analytical Framework

The parties do not point to a Kansas class action case that specifically recites the standard of appellate review for a district court's approval of a settlement. Generally, however, "[a]ppellate review of a trial court's approval of a property settlement agreement is limited to considering whether the trial court abused its discretion." *Cook v. Cook*, 231 Kan. 391, Syl. ¶ 1, 646 P.2d 464 (1982). Likewise, in this federal circuit, the appellate review standard for a district court's approval of a settlement agreement in a class action is also designated as an abuse of discretion. *Rutter & Wilbanks*

*Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1186 (10th Cir. 2002) (quoting *United States v. Hardage*, 982 F.2d 1491, 1495 (10th Cir. 1993).

Boles contends that there are legal questions involved in his challenges to the release of unlitigated claims and the inclusion of going forward provisions in the settlement agreement. Accordingly, he argues for a de novo standard of review. However, the interplay of legal conclusions is included within the definition of an abuse of discretion standard of review:

"Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. *State v. Gonzalez*, 290 Kan. 747, 755-56, 234 P.3d 1 (2010)." *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

Moreover, in this instance, the trial judge permitted Boles to present the live testimony of his expert. After observing the witness in open court, the district court's ruling on the credibility of that evidence is entitled to due deference.

Consequently, we will apply an abuse of discretion standard to our review of the district court's approval of the class action settlement with an understanding that an abuse of discretion occurs when the court goes outside the framework of or fails to consider proper legal standards. See *Farrar v. Mobil Oil Corp.*, 43 Kan. App. 2d 871, 876-77, 234 P.3d 19, *rev. denied* 291 Kan. 910 (2010). But Boles will bear the burden of showing that the settlement approval was an abuse of discretion. See *Harsh v. Miller*, 288 Kan. 280, 293, 200 P.3d 467 (2009).

The foregoing caveat that a trial judge must apply the proper legal standards in exercising his or her judicial discretion naturally leads to the query: What are the proper legal standards governing the court's approval of a class action settlement? At the time of this settlement, K.S.A. 60-223(e) provided that a dismissal or compromise of a class action required the approval of the court, but it did not specify standards or factors to guide the court's decision. Moreover, unlike the federal courts, Kansas appellate courts have not

adopted a specific test or list of factors which must be considered in evaluating class action settlements.

Some district courts have endeavored to generate their own list of factors to apply in considering whether to approve a class action settlement. Sources for such factors include federal court interpretations of federal Rule 23; the Manual for Complex Litigation, Fourth, § 21.62 (2004); and 4 Conte & Newberg, Newberg on Class Actions § 13:68, p. 480 (4th ed. 2002), which identifies six factors that should be considered by a state court when deciding whether to approve a settlement:

"(1) whether the parties negotiated the settlement at arm's length, or whether it was the product of fraud or collusion;

"(2) the complexity, expense, and likely duration of the litigation;

"(3) the stage of the proceedings, including the status of discovery;

"(4) the factual and legal obstacles that could prevent the plaintiffs from prevailing on the merits;

"(5) the possible range of recovery and the certainty of damages;

"(6) the respective opinions of the participants, including class counsel, class representatives, and the absent class members."

Recently, the Kansas Legislature amended K.S.A. 60-223 to clarify that "if the [settlement, dismissal, or compromise] proposal would bind class members, the court may approve it only after a hearing and *on finding that it is fair, reasonable and adequate*." (Emphasis added.) K.S.A. 2011 Supp. 60-223(e)(2). Interestingly, the "fair, reasonable, and adequate" language mirrors federal Rule 23, raising the question of whether the factors utilized by the federal courts with respect to their Rule 23 should be applied in our state courts as well. An example of the federal factors was applied by a panel of the Tenth Circuit Court of Appeals in evaluating a settlement agreement in a shareholders' derivative suit:

"In exercising its discretion, the trial court must approve a settlement if it is fair, reasonable and adequate. In assessing whether the settlement is fair, reasonable and adequate the trial court should consider:

(1) whether the proposed settlement was fairly and honestly negotiated;

(2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;

(3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and

(4) the judgment of the parties that the settlement is fair and reasonable." *Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 324 (10th Cir. 1984).

Newberg on Class Actions also describes a presumption of fairness that exists with respect to settlements under the federal rule:

"There is usually an initial presumption of fairness when a proposed class settlement, which was negotiated at arm's length by counsel for the class, is presented for court approval. . . .

. . . .

"The initial presumption of fairness of a class settlement may be established by showing:

1. That the settlement has been arrived at by arm's-length bargaining;

2. That sufficient discovery has been taken or investigation completed to enable counsel and the court to act intelligently;

3. That the proponents of the settlement are counsel experienced in similar litigation; and

4. That the number of objectors or interests they represent is not large when compared to the class as a whole." 4 Newberg on Class Actions § 11.41, pp. 90, 92-93.

The problem with mandating a specific list of factors or tests that must always be applied in exercising judicial discretion to approve a class action settlement is the risk of encouraging the district court to make a rote recitation of the mandated list in lieu of performing a logical and independent analysis of all of the relevant circumstances affecting a particular settlement in a particular class action for the benefit of the particular members of that class. Nevertheless, we need not determine here whether the federal factors will become a mandatory inquiry in all class action settlements in Kansas district courts, because the amendment to K.S.A. 60-223 simply does not govern this appeal. Instead, we will consider all of the relevant circumstances, including those factors deemed important by federal courts, to determine whether the district court in this case abused its discretion in finding that the settlement between APC and the plaintiff class was fair, reasonable, and adequate.

*Analysis*

Although Boles' expert opined that the class should have settled the gathering claims for $40 million or more, instead of $33 million,

Boles does not present a challenge on appeal to the district court's approval of the settlement agreement as it relates to the fully litigated gathering claims. See *National Bank of Andover v. Kansas Bankers Surety Co.*, 290 Kan. 247, 281, 225 P.3d 707 (2010) (issue not briefed deemed waived and abandoned); *Cooke v. Gillespie*, 285 Kan. 748, 758, 176 P.3d 144 (2008) (point incidentally raised but not argued in brief deemed abandoned). Instead, Boles argues that the district court went astray in permitting the class representative to release the non-gathering claims as part of the settlement because those claims were unlitigated and factually unrelated to the gathering claims, thereby creating a circumstance with insufficient adversity to protect the due process rights of the class members.

Additionally, Boles perceives that the settlement will have future adverse consequences that should have precluded district court approval. Specifically, he contends that the district court's approval of the "going forward provisions" judicially revised and amended the plaintiff class members' decades-old oil and gas leases and judicially legislated new, contravening legal principles that will alter the future conduct and governance of the parties. Boles also warns that the binding arbitration provision of the settlement agreement will lock the courthouse doors to any future class actions by wronged royalty owners. But we will begin by addressing the non-gathering claims.

*Release of Non-Gathering Claims*

Boles contends that, because the non-gathering claims were not fully litigated at the bench trial, there was no adverse litigation between the plaintiff class and APC with respect to those claims. He creatively argues that, without adverseness, there can be no case or controversy under Article III of the United States Constitution, albeit he provides no case precedent for applying that federal constitutional case or controversy analysis to state court class action settlements. Additionally, he argues that the due process rights of absent class members are violated when unlitigated claims are settled. He goes so far as to declare that "the litigated claims in a class action can be legally settled, if the settlement is fair,

reasonable, and adequate; whereas, the Unlitigated Claims cannot." We disagree.

Boles preemptively argues against the application in this case of the identical factual predicate rule, apparently recognizing that the rule might be used to permit " ' " 'the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action.' " ' " *Wallace B. Roderick Revocable Living v. XTO Energy*, 679 F. Supp. 2d 1287, 1308 (D. Kan. 2010) (quoting *Matsushita Elec. Industrial Co. v. Epstein*, 516 U.S. 367, 376-77, 116 S. Ct. 873, 134 L. Ed. 2d 6 [1996]) (hereafter *Roderick*). Boles claims that the non-gathering claims here cannot fit within this rule because the witnesses and evidence needed to prove them were not identical to that needed to prove the gathering claims. But, generally, "the identical factual predicate rule does not require that claims be pled or litigated to be released," and, in particular, "the claimed underpayment of royalties allegedly owed by [lessee] under oil and gas leases" can be the applicable factual predicate supporting the release of unlitigated non-gathering claims. 679 F. Supp. 2d at 1308.

To date, this court has not expressly applied the identical factual predicate rule to evaluate a class action settlement agreement. Yet the concept is compelling in this case. If the non-gathering claims were based on the same underlying cause of action as the gathering claims, then settlement of both claims at once is not only permissible, but also preferable and perhaps mandatory. See *Roderick*, 679 F. Supp. 2d at 1308 (settlement release in prior cases entitled defendant to summary judgment on the basis of res judicata and settlement, because settlement in prior cases included the putative "Unlitigated Claims" in the current class action, such as claims for failure to pay for NGLs, condensate, helium, and nitrogen). Accordingly, we pause to look at the legal theories underlying both the gathering and the non-gathering claims as they relate to Kansas law.

All of the parties cite to *Sternberger v. Marathon Oil Co.*, 257 Kan. 315, 894 P.2d 788 (1995), which is a seminal case in Kansas on the allocation between lessor and lessee of post-production ex-

penses for natural gas wells, particularly gathering and transportation expenses. *Sternberger* reviewed a number of prior cases dealing with the point at which the price of gas was to be determined for royalty purposes and the expenses which a lessee could allocate to the royalty owners' share. Notwithstanding some inconsistencies in those prior holdings, the *Sternberger* court discerned that the law in Kansas was the same as that stated by the Colorado Supreme Court in *Garman v. Conoco, Inc.*, 886 P.2d 652 (Colo. 1994), which *Sternberger* related as follows:

"Once a marketable product is obtained, reasonable costs incurred to transport or enhance the value of the marketable gas may be charged against nonworking interest [royalty] owners. The lessee has the burden of proving the reasonableness of the costs. Absent a contract providing to the contrary, a nonworking interest [royalty] owner is not obligated to bear any share of production expense, such as compressing, transporting, and processing, undertaken to transform gas into a marketable product. In the case before us, the gas is marketable at the well. The problem is there is no market at the well, and in that instance we hold the lessor [royalty owner] must bear a proportionate share of the reasonable cost of transporting the marketable gas to its point of sale." 257 Kan. at 331.

We believe that the law according to *Sternberger* can be summarized as follows. The lessee (oil and gas company) must bear the entire expense of producing the gas at the wellhead pursuant to the terms of the oil and gas lease. Additionally, the lessee must also bear the entire cost of putting the gas in condition to be sold pursuant to the court-made "marketable condition rule." But once the gas is in marketable condition, regardless of whether a market actually exists at that point, the lessor (royalty owner) can be charged with his/her/its proportionate share (*e.g.*, 1/8) of the cost to transport the gas to a market and a proportionate share of the cost to enhance the value of the gas stream, *e.g.*, the processing costs to extract a saleable component such as helium.

Interestingly, the Colorado Supreme Court has subsequently disapproved of *Sternberger's* interpretation that the "at the well" lease language provides a sufficient basis for charging transportation costs against the royalty owners. See *Rogers v. Westerman Farm Co.*, 29 P.3d 887, 896-902 (Colo. 2001). *Rogers* clarified that every oil and gas lease contains an implied duty of the lessee to

market the gas and that lessees must bear all of the expenses incurred in order for the gas to reach that marketable condition. 29 P.3d at 902, 903. Most importantly, however, *Rogers* held that "marketability" includes both the physical condition of the gas and the location of the gas, *i.e.*, the commercial marketplace. 29 P.3d at 905. Under that test, *Sternberger*'s holding that gas can be in marketable condition at a point at which no market exists may be questionable.

Turning now to the instant lawsuit, the plaintiff class' gathering claims were predicated upon the assertion that the gas being produced from their wells was not a marketable product at the well sites. The argument centers on the Federal Energy Regulatory Commission (FERC) tariffs requiring natural gas to be in a certain condition before it enters the interstate pipeline. The class argues that the well site gas does not meet the federal standard; it must be compressed, dehydrated, and stripped of liquids at the processing plant before it can enter the interstate pipeline. Moreover, because there is no commercial index price for the gas at the wellhead, at the gathering line inlet, or at any other point short of the interstate pipeline inlet, the class argues that the gas does not become a fungible commercial commodity until it is ready for the interstate pipeline. Accordingly, the class claims that all of the costs to move the gas to the interstate pipeline inlet, including the gas consumed to operate the compressors, are expenses incurred to put the gas in marketable condition and should not have been deducted from the royalties. The class did not include the costs incurred at the processing plants because those costs were not being charged against the royalties.

Although Boles would have us view his non-gathering claims as being a separate and distinct cause of action, they are in reality simply additional damages for the class' allegation of a breach of contract. Both the class members' claim for reimbursement of their proportional share of the costs to move the gas from the well site to the interstate pipeline and Boles' claim for a share of the gross sales prices of extracted components (NGLs, helium) depend on winning the marketable condition issue. If the gas is deemed to be in marketable condition at the well site, *Sternberger* says that the

lessee can charge the royalty owners for both transportation and value-enhancement costs pursuant to the royalty provision of the oil and gas lease, *i.e.*, royalty owners would get nothing in this lawsuit for either gathering or non-gathering claims.

This circumstance is a textbook example of an identical factual predicate, and it illustrates the efficacy of the rule. If the plaintiff class had settled only the gathering claims and Boles had brought a new class action for the non-gathering claims, the non-gathering claims lawsuit would have, by necessity, replicated the first lawsuit up to the point of proving the measure of damages. Nevertheless, even without such a rule, we cannot say that the non-gathering claims were truly unlitigated. Most of the groundwork for establishing APC's liability for the non-gathering claims was laid in the bench trial, *i.e.*, where the theory of APC's liability for both types of claims was subjected to plenty of adverseness. Therefore, we have no due process concerns with the settlement of the non-gathering claims, along with the gathering claims, because they are based on the same underlying facts and theory of liability.

Having determined that the district court's approval of the settlement of the non-gathering claims was not guided by an erroneous legal standard, we turn to a consideration of whether the settlement approval was arbitrary, fanciful, or unreasonable. Boles suggests that the district court did not make adequate findings to allow us to review whether it appropriately exercised its discretion. A comparison of the district court's Journal Entry of Judgment, dated September 17, 2009, with the four federal court factors recited above from *Jones*, 741 F.2d at 324, belies that suggestion.

The first enumerated consideration is "whether the proposed settlement was fairly and honestly negotiated." *Jones*, 741 F.2d at 324. The journal entry recites that "[t]he Court finds that the Settlement as set forth in the Stipulation was arrived at through arms-length and vigorous and extensive negotiations between Class Counsel and counsel for APC." The record supports that finding. The action was actually litigated at a bench trial. Only after a decision was not forthcoming for years did the parties attempt to settle. After an attempt at mediation failed in early 2008, APC assigned a new lead counsel and settlement talks resumed in the

summer of 2008. Negotiations continued for months, until an agreement was finally reached in June 2009. It would be difficult to imagine a more honest negotiation.

The second enumerated consideration is "whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt." *Jones*, 741 F.2d at 324. The journal entry specifically addressed that factor by stating "that there exist serious questions of law and fact which place the ultimate outcome of this litigation in doubt and that, while the Settlement Class might possibly ultimately receive more, if the case was to be prosecuted to its ultimate conclusion, it is also possible that there would be no recovery." As noted above, pursuant to *Sternberger*, the class' gathering claims would turn on whether the gas was marketable at the well site, which presented both factual and legal questions. APC remains adamant that the gas is in marketable condition at the well sites. Interestingly, an attachment to Boles' appellate brief might provide some support for APC's position. The attachment is a drawing, marked "Exhibit 10," which depicts the stages and processes through which the gas moves between the well and the interstate transmission pipeline. The drawing indicates that some of the gas leaves the well site in a line designated "free house gas," suggesting that the gas at the well site is in a marketable condition for household use. Likewise, the drawing shows that, after the gas has been metered into the gathering system but before it gets to the processing plants, a pipeline labeled "irrig. sales" exits the system, suggesting that the gas is in marketable condition for use in irrigation systems before it is in a condition to enter the interstate transmission pipeline. Obviously, as the district court opined, there are unresolved factual and legal questions regarding the marketability of the subject gas that cast considerable doubt on the outcome of the bench trial in this case.

Moreover, if the gathering claims failed, then Boles' putative non-gathering claims would also necessarily fail. But the converse is not necessarily true; a plaintiff could recover damages for the gathering claims, but lose on non-gathering claims. In short, the outcome of a claim for non-gathering damages is even more uncertain than the litigated gathering claims and the district court

was spot-on correct in finding that the ultimate outcome of this litigation was seriously in doubt when the settlement was reached.

The third enumerated consideration is "whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation." *Jones*, 741 F.2d at 324. The district court found that the settlement was "arrived at in good faith and was based on a realistic appraisal by the parties and their counsel of the difficulties inherent in a case of this magnitude and complexity." Further, the court recognized that, without this settlement, "even if the Settlement Class had prevailed, any recovery would have been delayed for a lengthy period of time given the high probability of an appeal." Of course, Boles' appeal negated some of the benefit of delay-avoidance. But the point is that the district court considered the factor.

The final enumerated consideration is "the judgment of the parties that the settlement is fair and reasonable." 741 F.2d at 324. At the fairness hearing, the trial court heard one of the attorneys representing the settlement class testify that the class counsel believed that the non-gathering claims had no merit but that they could be leveraged to increase the amount of settlement on the gathering claims. The attorney put a number on that belief by stating that "if those claims had not been included in the release, I seriously doubt that we would have gotten [APC] above 83 or 84 percent of the total deductions." Obviously, in class counsel's judgment, the settlement was fair and reasonable. Apparently, the members of the class felt likewise, given that an insignificantly small number of eligible class members opted out of the class action and only one of the remaining members objected to the settlement.

Consequently, we find that the district court did not abuse its discretion when it determined that the settlement agreement between the plaintiff class and APC was fair, reasonable, and adequate, notwithstanding the settlement's release of non-gathering claims.

### Going Forward Provisions and Arbitration

Boles also contends that the district court's approval of the going forward provisions in the settlement agreement was an abuse of

the class action process and a violation of state and federal constitutional rights. In his brief, Boles defined the going forward provisions as follows, with the citations to the record omitted:

"*Going Forward Provisions:* Sections IV, V, and IX of the Settlement Agreement. The future royalty payment provisions pay royalty on '97% of the first arm's length sale less $0.31/Mcf'. Actually, it is 97% of the 'net' arm's length sales price, and the netted out costs are entirely unknown to experts and APC. 100% of the 'net' sale price was estimated by APC to be 1% less than the Index price APC had been paying. The $0.31/Mcf is down from the $0.36/Mcf APC had been deducting. Gathering fuel would no longer be deducted, but, unlike BP, OXY and UPR (another APC subsidiary), APC would pay nothing for Condensate, NGLs, or any other product, except Helium on a 'net' basis as they had been. All future disputes with royalty owners go to binding arbitration."

Boles' definition of the going forward provisions reads more like an argument as to why the agreement on the method for calculating future royalties provided an inadequate price. But he does not brief that argument. See *Cooke*, 285 Kan. at 758 (point raised incidentally in brief but not argued deemed abandoned). Moreover, as will be noted below, the statement that *all* future disputes with royalty owners will go to binding arbitration is simply incorrect. But we begin by reviewing the sections of the settlement agreement that Boles identifies as going forward provisions.

Section IV of the settlement agreement is entitled "Future Royalty Methodology and Reporting." The provision states that APC was in the process of implementing accounting changes that would permit a calculation of a weighted average sale price (WASP) for residue gas, and that the WASP calculation would be used to compute royalties after the accounting changes were implemented. The section contains a description of how royalties are to be calculated on gas sold to an affiliate, both before and after the WASP implementation date. The methodology includes a deduction only for those gathering or transportation costs that are incurred after the gas exits the processing plant or, for unprocessed gas, after the gas is placed in condition to enter the applicable interstate pipeline. On the other hand, APC will not have an obligation to pay any royalty on NGLs or other by-products extracted from the gas stream, except for the net sales of helium. In other words, in the

future, APC will not charge the class members the expenses they sought to recoup as gathering claims in the settled lawsuit, but it will also not be responsible for the additions to royalties designated as non-gathering claims by Boles.

Section IV also sets forth in detail the information to be contained on the royalty check stub for each production month, or on a supplemental document, with respect to both gas and helium royalties. Then, subsection 4.13 provides that any dispute or discrepancy concerning the calculation or payment of royalties or the providing of royalty check stub information under Section IV which cannot be resolved informally must be submitted to binding arbitration. But, pursuant to subsection 4.11, the provisions of 4.13 do not apply to disputes over royalties on gas that is not sold to an affiliate of APC. Rather, subsection 4.11 expressly states that "[n]othing contained herein addresses the manner in which royalty on production that is not sold to an Affiliate shall be calculated, and APC and Participating Settlement Class Members or their successors shall be free to act in what they deem to be their best interests with regard to any such production, including litigation."

Section V addresses information that APC agreed to provide to the attorneys for the plaintiff class to assist in providing notice of the settlement terms and to assist in developing a plan of allocation of the settlement fund. Section IX is entitled "Arbitration" and states that disputes arising out of the stipulation of settlement shall be resolved by binding arbitration.

Boles attacks the going forward provisions from a number of angles. From a contract perspective, he asserts that the going forward provisions dealing with future royalty calculations modified the terms of the existing oil and gas leases. Then, he complains that the district court violated the well-established rule of contract construction that precludes a court from altering the contract's terms. That argument is unavailing for a number of reasons.

First, the settlement effected an agreement on how the leases should be construed rather than modifying them. The lawsuit was tried on the theory that APC, as lessee under the oil and gas leases, had the duty to bear the gathering and fuel costs it was deducting from the royalties. The leases did not explicitly answer the ques-

tions presented in the lawsuit or in the settlement negotiations, so the agreement on how to answer those questions can hardly be characterized as a contract modification.

In any event, the *court* did not make any contract modifications. Even if one were to characterize the settlement agreement as a contract modification, it would have been the *parties* that effected the modification, which they were certainly permitted to do. See, *e.g.*, K.S.A. 55-1621 ("Nothing contained in this act shall be construed to amend or otherwise affect any contractual obligations or rights which may otherwise exist."); *Thomas Well Service, Inc. v. Williams Natural Gas*, 873 F. Supp. 474, 487 (D. Kan. 1994) (express contractual terms will control over public policy); *Farrar v. Mobil Oil Corp.*, 43 Kan. App. 2d 871, 886, 234 P.3d 19, *rev. denied* 291 Kan. 910 (2010) (express contractual provisions control over implied covenants); *Howerton v. Gas Co.*, 81 Kan. 553, 106 P. 47 (1910) (contract language must govern over mutual benefit rule). The court's role with respect to that private consensual agreement was merely " 'to ensure that the agreement is not the product of fraud or collusion and that, taken as a whole, it is fair, adequate, and reasonable to all concerned.' " *Christina A. ex rel. Jennifer A. v. Bloomberg*, 315 F.3d 990, 992 (8th Cir. 2003) (quoting 5 *Moore's Federal Practice* § 23.82[1] [3d ed. 2000]).

As noted above, the court performed its function, finding that the settlement agreement was the product of arm's-length, honest negotiations and that the agreement was fair, adequate, and reasonable to all concerned. Granted, the trial court did not specifically mention the going forward provisions, but they deal with essentially the same questions about gathering versus non-gathering claims. Boles' underlying complaint is that, although the going forward methodology for royalty calculation essentially gives the class members their gathering claims, it omits his non-gathering claims. In that regard, the district court specifically addressed the questionable nature of those non-gathering claims in its journal entry approving the settlement.

Next, the going forward provisions in the settlement agreement gave the plaintiff class exactly what it had requested in its original prayer for relief. It specifically sought an order permanently pro-

hibiting defendant from calculating royalty payments by deducting production and marketing costs. Of course, to do otherwise would have made no sense. If the class had just obtained a settlement of damages for past underpayments, without extracting an agreement from APC to calculate royalties in the future pursuant to an acceptable methodology, the royalty owners would have to file another lawsuit when APC continued to pay royalties based on the old method. Rather than being unconstitutional, the inclusion of going forward provisions in the settlement agreement was absolutely necessary for the class members to get meaningful relief.

Turning to the arbitration provisions, we note that Boles' arguments rely on an overstatement of their effect; he contends that the arbitration provisions "would lock royalty owners out of court forever." As noted, the settlement agreement, and by necessity the arbitration requirements contained therein, only apply to gas sales by APC to one of its affiliates. Subsection 4.11 of the settlement agreement specifically states that disputes over royalties on non-affiliate sales are subject to litigation, not arbitration.

Moreover, arbitration agreements are generally favored by Kansas courts. See *Hemphill v. Ford Motor Co.*, 41 Kan. App. 2d 726, 735, 206 P.3d 1 (2009). The United States Supreme Court has noted that parties are generally free to structure arbitration agreements as they see fit. *Stolt-Nielsen S.A. v. Animalfeeds International*, 559 U.S. 662, 130 S. Ct. 1758, 1774, 176 L. Ed. 2d 605 (2010). Arbitration agreements have been upheld in the context of class actions as well. See, *e.g.*, *Shell Oil Co. v. CO2 Committee, Inc.*, 589 F.3d 1105, 1110 (10th Cir. 2009); *Heimann v. Kinder-Morgan CO2 Co., L.P.*, 140 N.M. 552, 559-60, 144 P.3d 111 (2006) (presuming the validity of an arbitration clause contained in class settlement agreement when evaluating scope of clause). Pointedly, Boles' argument that the arbitration agreement violates his right to trial by jury under the Kansas Constitution is devoid of any precedential support or logical appeal.

Boles also challenges the notice given to the class members on the basis that it did not specifically advise the recipients that they were waiving their inviolate right to trial by jury under Section 5 of the Kansas Constitution Bill of Rights. While creative, the ar-

gument is unavailing. The notice informed the class members that future disputes related to the terms of the settlement agreement would be subject to arbitration unless the member opted out of the class. The class members had sufficient information in the notice to make a voluntary and intelligent choice. By not opting out and accepting the benefits of the settlement agreement, the remaining class members elected to accept the arbitration agreement.

Finally, Boles' hyperbolic declaration that the going forward provisions effect a "*de facto* impermissible future release for future wrongs" fails to recognize that the settlement agreement is limited to its factual predicate, *i.e.*, the allocation of post-production expenses between APC and the royalty owner. The parties reached an agreement on how royalties should be calculated and paid; if there is a dispute in the future as to what their agreement means, they will submit that question to arbitration. The settlement agreement does not effect a general release of all claims a royalty owner might have in the future against APC; it is a conditional release of the settled claims. The going forward provisions do not invalidate the settlement agreement.

In short, we conclude that the district court did not abuse its discretion when it approved the settlement agreement between the plaintiff class and APC.

Affirmed.

Nuss, C.J., not participating.

Greene and Malone, JJ., assigned.