No. 120,371

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

COOPER CLARK FOUNDATION,
On Behalf of Itself and All Others Similarly Situated,
*Appellees*,

v.

OXY USA INC.,
*Appellant*.

SYLLABUS BY THE COURT

1.

Under Kansas law, all gas leases impose an implied duty on the gas company (the lessee) to market any gas produced from the well. Unless disclaimed by express language, that means the gas company must market its product at reasonable terms within a reasonable time following production.

2.

A corollary of the gas company's duty to market the gas is the marketable-condition rule. Under that rule, the gas company must make the gas marketable at its own expense, which means that expenses required to make the gas marketable cannot be deducted from royalty payments. Once the gas is in marketable condition, expenses may be deducted from royalty payments.

3.

The concept of marketability is tied to the market for the gas. When the parties have agreed that the gas will be sold in the interstate market, the gas company cannot deduct expenses required to make the gas marketable for the interstate market.

4.

When the parties have agreed that the gas at issue will be sold in the interstate market, that some of the gas produced from the same well could be used at the wellhead or at a farmhouse does not make the gas at issue marketable under the marketable-condition rule.

5.

The district court has considerable discretion in deciding whether certification of a class-action lawsuit is appropriate. If the court considers the relevant factors listed in K.S.A. 2019 Supp. 60-223, the appellate court reviews the decision only for abuse of discretion. The district court abuses its discretion if its decision is based on legal or factual error, or if its discretion is arbitrary or unreasonable. Factual findings must be supported by substantial evidence; underlying legal issues are reviewed independently, with no required deference to the district court.

Appeal from Grant District Court; BRADLEY E. AMBROSIER, judge. Opinion filed June 26, 2020. Affirmed.

*Mark C. Rodriguez* and *Deborah C. Milner*, of Vinson & Elkins LLP, of Houston, Texas, and *James M. Armstrong* and *Mikel L. Stout*, of Foulston Siefkin LLP, of Wichita, for appellant.

*Rex A. Sharp, Barbara C. Frankland, Ryan C. Hudson,* and *Scott B. Goodger*, of Sharp Law LLP, of Prairie Village, for appellees.

Before LEBEN, P.J., GARDNER, J., and MCANANY, S.J.

LEBEN, J.: Oxy USA Inc. appeals the district court's decision to certify Cooper Clark Foundation's class-action lawsuit. Cooper sued on behalf of Kansas landowners with leases allowing Oxy to extract natural gas from their property in exchange for a monthly payment. Cooper alleges that Oxy underpaid landowners for several years by

subtracting processing expenses from payments in violation of Oxy's duties under the leases. On appeal, Oxy raises four issues with the district court's certification decision. We begin with a preview of those issues and how we'll resolve them.

First, Oxy argues that the district court misapplied a legal doctrine underpinning many of Cooper's claims: the marketable-condition rule. Oxy says the court misread a case applying that rule, *Fawcett v. Oil Producers, Inc. of Kansas*, 302 Kan. 350, 352 P.3d 1032 (2015). Oxy contends that, under *Fawcett*, the class cannot be certified because the district court can't decide whether gas was marketable without evaluating gas quality from individual wells. But Oxy misreads *Fawcett* and ignores the way in which Cooper has defined the proposed class. Under Cooper's class definition, the only gas included is gas bound for the interstate market. So even if some small amount of gas could be used at the wellhead to run equipment or at a nearby farmhouse to provide heat, that wouldn't affect the marketability of the gas headed to the interstate market. And only that gas is included in Cooper's class.

Second, Oxy challenges the district court's commonality finding. A district court can't certify a class without finding commonality, meaning that all class members' claims depend on a common contention that's capable of resolution classwide. Oxy says several aspects of Cooper's claims present individual questions that should have precluded a commonality finding. But Cooper supplied ample evidence for the district court to find that the class petition raised several common questions, so the district court was right to reject Cooper's contrary claims.

Third, Oxy attacks the district court's predominance finding. Cooper certified the class under K.S.A. 60-223(b)(3), so the district court had to find that questions common to all class members predominated over those affecting only individual members. Oxy says that its statute-of-limitations defense presents individual questions that predominate because the district court will have to consider whether each class member has an excuse

3

for failing to timely file their claims. But Oxy's defense can be litigated classwide; and even if it could not, the individual questions that defense might pose would not predominate. So the district court didn't abuse its discretion in finding predominance.

Last, Oxy claims that the district court failed to rigorously analyze the statutory requirements for class certification. Oxy points out that, before certifying the class, the district court didn't expressly rule on Oxy's motion to strike Cooper's expert testimony. Oxy says the failure to do so violated a requirement that the district court rigorously analyze the statutory requirements for class certification. Yet nothing in the substance of Oxy's motion would have precluded certification. And even if the district court should have ruled on Oxy's motion before certifying the class, the court implicitly did so with detailed findings rejecting the substance of Oxy's motion. On Oxy's last argument, like the other three, we find no error in the district court's decision to certify Cooper's class action.

FACTUAL AND PROCEDURAL BACKGROUND

We consider the issues of this appeal in the context of how gas is produced from the Hugoton Field. That field was once described as the largest reservoir of natural gas in the world. It's no surprise, then, that most Hugoton Field gas doesn't stay in Kansas—it's sent to pipelines for sale in the interstate market. See *Coulter v. Anadarko Petroleum Corp.*, 296 Kan. 336, 339, 292 P.3d 289 (2013); *Southwest Kan. Royalty Owners Ass'n v. Kansas Corporation Comm'n*, 244 Kan. 157, 160, 769 P.2d 1 (1989).

To understand the background of the case so that we can then discuss the legal issues of this appeal, we will first review the gas-production process and the gas leases at issue. When we get to the leases, each lease has a lessor, the landowner who grants rights to extract gas beneath the surface, and a lessee, the gas company that takes the gas to market it. For the ease of the lay reader, we'll simply refer to the lessee as the gas

4

company throughout this opinion. Cooper seeks to represent the lessors in this class action; Oxy is the gas company or lessee.

*The production process*

This case involves a class-action lawsuit about natural-gas leases. Cooper represents 190 Kansas gas wells owned and operated by Oxy until 2014 (Class Wells). Oxy produced gas from Class Wells under 245 leases (Class Leases). The leases covered wells in the Hugoton Field, which stretches from southwest Kansas down through the panhandles of Oklahoma and Texas.

Most but not all Hugoton gas is bound for the interstate market—a small amount is used near the well in its raw form. You can use raw gas to heat a home (House Gas) or power irrigation equipment (Irrigation Gas). Or you can use it in the field to power gas-production equipment (Field Gas). But most Hugoton gas isn't used near the well—nearly all of it (about 99%) is sent for processing and sale in the interstate market.

That's what happened in our case. Oxy sent a small amount of gas from Class Wells for use in its raw form near the well: gas from 13 Class Wells was used as House Gas and gas from 24 Class Wells (about 2% to 3% of all gas from Class Wells) was used as Irrigation Gas. But most Class Wells (160 of 190) sent no gas for use as House or Irrigation Gas. Oxy used some gas from an unknown number of Class Wells as Field Gas to power its pumps and compressors.

Oxy sent the rest of the gas drilled from Class Wells for processing at the Jayhawk Plant under a contract with Amoco Production Company, the Plant's owner. Cooper's class definition includes only the gas from Class Wells sent for processing at the Plant (Class Gas); it excludes any raw gas from Class Wells used as House, Irrigation, or Field Gas.

At the Plant, Amoco extracted three individual components from raw Class Gas: Natural Gas Liquids (NGLs), Crude Helium, and Residue Gas. Amoco charged an in-kind processing fee for its services: it retained 25% of NGLs and 50% of Crude Helium extracted from Class Gas. It also charged a processing fee for Residue Gas. Then Amoco delivered the three extracted components, minus the amount retained as a processing fee, back to Oxy at the Plant. So Oxy received 100% of Residue Gas, 75% of NGLs, and 50% Crude Helium.

After processing, Oxy sold the components in the interstate market. Those sales had to occur after processing—until then, raw gas doesn't meet the minimum-quality standards set by the Federal Energy Regulatory Commission (FERC) for transporting gas on interstate pipelines. Oxy sold Residue Gas to its affiliate entity Occidental Energy Marketing, Inc. Occidental Energy paid Oxy the Southern Star Index Price—an established interstate-pipeline price based on a survey of transactions over a given period. Then Occidental Energy resold Residue Gas to third-parties. Occidental Energy also marketed NGLs for Oxy, selling the product to third-parties and passing on proceeds to Oxy. Oxy had a similar arrangement with Amoco for Crude Helium—Amoco marketed the product and passed on proceeds it received from buyers to Oxy.

*The royalty clauses*

We've focused so far on the production process, tracing Class Gas from the well where Oxy extracted it to the interstate market where Oxy sold it. But to understand Cooper's claims, it would help to understand how Oxy paid landowners under Class Leases.

Like all natural-gas leases, Class Leases require Oxy to pay royalties. Royalties are paid monthly from the gas company to a landowner (the lessor) when land burdened

6

by a lease produces gas. Cooper and Oxy dispute the proper method of calculating royalty under Class Leases. Oxy points to three types of royalty clauses recognized in Kansas: proceeds, market value, and *Waechter*. Under proceeds leases, the gas company pays royalty based on a percent of the actual money it receives from selling the gas. But with market-value leases, Oxy says the gas company pays based on the price a willing buyer would pay a willing seller in a free market. *Waecther* leases—named after the lease type in *Waechter v. Amoco Production Co.*, 217 Kan. 489, 537 P.2d 228 (1975)— combine aspects of proceeds and market-value leases, with payment depending on where the gas was sold.

In the district court, both parties submitted a chart categorizing Class Leases by their royalty clauses. Both charts categorize Class Leases into 14 forms. Oxy's chart also sorts the leases into the three types we just mentioned. By Oxy's count, Cooper's class includes 114 *Waechter* leases, 104 market-value leases, and 27 proceeds leases. Oxy's chart also classifies each lease form by the volume of gas on which Oxy says it had to pay royalty. Cooper disputes these classifications.

*The class action*

On February 16, 2017, Cooper filed a class-action petition alleging that Oxy had underpaid royalties on Class Gas from July 1, 2007, to April 30, 2014 (Class Period). Oxy did so, the petition claimed, by deducting several processing expenses from royalties. Cooper said that those deductions violated Oxy's duties under Class Leases and entitled class members to recovery of unpaid royalties.

Cooper sought to recover expenses from four deductions. First, Cooper alleged that Oxy deducted processing fees charged by Amoco for Residue Gas. Second, Cooper claimed that Oxy didn't pay royalty on the full volume of NGLs and Crude Helium recovered from Class Wells. In other words, Cooper said that Oxy didn't pay any royalty

7

on the 25% NGLs and 50% Crude Helium retained by Amoco. Third, Cooper said Oxy paid royalty for Residue Gas on the Index Price rather than on the price Occidental Energy received from third parties when it resold the Gas. According to Cooper, Occidental Energy's resale price was usually higher than the Index Price.

Last, Cooper sought to recover interest on Conservation Fees deducted from royalty. Oxy pays Conservation Fees to the Kansas Corporation Commission and had been deducting them from royalty. It repaid those Conservation Fees to class members after our Supreme Court held that gas companies couldn't deduct them from royalty. But Oxy paid no interest on the repaid Conservation Fees. Cooper said that Oxy should have to pay interest on repaid Conservation Fees.

When Cooper moved to certify these claims as a class action, Oxy objected. And Oxy moved to strike the testimony of Cooper's expert witness. Cooper filed a reply brief supporting its certification motion and moved for partial summary judgment on several issues Oxy raises in this appeal. Oxy hadn't responded to Cooper's summary-judgment motion before the district court certified the class, so the district court hasn't yet ruled on it and that motion is not before us on appeal.

*The certification order*

In a 24-page order, the district court granted Cooper's motion and certified the class. The district court identified the statutory requirements for certification and discussed each separately. See K.S.A. 2018 Supp. 60-223(a), (b)(3). It devoted 11 pages to the commonality requirement, identifying several common questions supporting certification:

- Oxy's legal duties under Class Leases, including the duty to market;

8

- Whether Oxy breached the duty to market by deducting processing costs from royalty;
- Whether Oxy breached the mutual-benefit or best-available-price rule by paying royalty for Residue Gas on the Index Price rather than Occidental Energy's resale price; and
- The damages calculation.

The court rejected Oxy's commonality arguments. Oxy had argued that because some gas from Class Wells had been used for House, Irrigation, and Field Gas, some Class Gas may have been marketable at the well. So determining when Class Gas was marketable, according to Oxy, presented individual questions that required a well-by-well analysis. Oxy had also argued that Hydrogen Sulfide (H2S) in some Class Wells may have made Class Gas unmarketable at the well. The district court considered Oxy's marketability arguments and found that they didn't preclude a commonality finding.

Having found that Oxy met the prerequisites for certification under K.S.A. 60-223(a), the court next addressed the predominance requirement of K.S.A. 60-223(b)(3). Oxy had argued that its statute-of-limitations defense raised individual issues that would predominate over questions common to all class members. The court found that it need not consider evidence relevant to affirmative defenses like the statute of limitations when deciding predominance. Yet the court still considered Oxy's defense, concluding that predominance remained intact because the parties could litigate Oxy's defense classwide. Because the court found that Cooper's petition met the statutory requirements, it certified the Class.

Oxy appealed the district court's certification decision to our court.

ANALYSIS

When a party challenges a district court's decision to certify a class action, as Oxy does here, we begin our analysis with the class-action statute, K.S.A. 2019 Supp. 60-223. That statute gives the district court substantial discretion in deciding whether certification is appropriate. If the trial judge considers the relevant factors listed in the statute, then we review its decision for abuse of discretion. It abuses its discretion if its decision is based on legal or factual error, or if its decision is arbitrary or unreasonable. Factual findings must be supported by substantial evidence; we review legal questions independently, with no required deference to the district court. *Coulter*, 296 Kan. at 351-52.

To certify a class action, the district court must make two findings. First, it must find that the class meets four prerequisite requirements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. K.S.A. 2019 Supp. 60-223(a). Second, it must find that one of the circumstances in K.S.A. 2019 Supp. 60-223(b) exists; the district court found that common questions would predominate over individual ones under K.S.A. 2019 Supp. 60-223(b)(3). Oxy raises four issues with the district court's certification decision that each relate to one of the perquisite requirements in subsection (a) or the circumstances in subsection (b). We will address each of Oxy's four arguments.

I. *The District Court's Certification Decision Was Not Based on a Misreading of* Fawcett.

Oxy first argues that the district court certified Cooper's class based on a misinterpretation of our Supreme Court's opinion in *Fawcett*. That case dealt with the meaning of a legal doctrine called the marketable-condition rule. To better understand Oxy's position, we briefly discuss the general principles of that rule.

Under Kansas law, all gas leases impose an implied duty on the gas company to market any gas produced from a well. Unless disclaimed by express language, that means the gas company must market its product at reasonable terms within a reasonable time

following production. *Fawcett*, 302 Kan. at 351. A corollary of that duty is the marketable-condition rule, which requires gas companies to make gas marketable at their own expense (meaning they can't deduct those expenses from royalty). 302 Kan. at 352, 361. But when is gas considered in a "marketable condition" so that a company can start deducting expenses?

Oxy's first argument is rooted in the parties' disagreement on the answer to that question. Oxy says the district court adopted Cooper's view that, under *Fawcett*, Class Gas was marketable only after it was sold in good faith. That view misreads *Fawcett*, Oxy argues, because *Fawcett* didn't alter the long-held rule in Kansas that gas can be marketable at the well before it is sold. And if that's the case, then certification may have been improper because the district court would have to analyze each Class Well one-by-one to see if the gas from that well was marketable based on several factors. Put another way, it would have to conduct the kinds of individualized inquiries that preclude a commonality finding. So Oxy asks us to instruct the district court to consider whether certification is appropriate under Oxy's reading of *Fawcett*. We turn next to *Fawcett* so we can resolve the parties' divergent views on its holding.

Like our case, *Fawcett* involved a class action for royalty underpayment. But unlike this case, the gas company in *Fawcett* sold the gas to third parties at the well. The third parties paid the gas company a price that deducted processing costs, then the gas company paid royalty based on that price rather than on the gross value of the gas without processing costs subtracted. The plaintiffs argued that paying royalty with processing costs deducted violated the marketable-condition rule. The gas was not marketable, argued the plaintiffs, until it entered interstate pipelines after processing. So the gas company should have incurred all costs necessary to prepare the gas for interstate transmission, including the deducted processing costs. 302 Kan. at 351-52.

11

The Kansas Supreme Court disagreed. The court acknowledged that when gas becomes marketable remains an "open question" in Kansas. 302 Kan. at 363-64. But whatever marketable means, gas is always marketable when it has been sold. The first sale of the gas at issue occurred at the well. When that sale occurred, the gas must have been in a *marketable* condition because it had been *marketed*. 302 Kan. at 364. "[T]he duty to make gas marketable is satisfied," the court said, "when the operator delivers the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction." 302 Kan. at 365. So the gas company in *Fawcett* could deduct the processing costs without violating the marketable-condition rule because it had incurred those costs after the point at which the gas became marketable—the first sale at the well. 302 Kan. at 365-66.

Now let's return to the parties' dispute about *Fawcett*'s holding. Recall that Cooper reads *Fawcett* as holding that gas cannot be in a marketable condition until it is sold in a good-faith transaction. Under that view, Oxy violated the duty to market when it deducted pre-sale expenses from royalty. But *Fawcett* didn't say that gas is marketable *only* when it is sold; it said that a good-faith sale satisfies the marketable-condition rule because gas that has been marketed is always marketable. In other words, a sale is sufficient but not necessary for gas to be in a marketable condition. See 302 Kan. at 365. If the court had intended for sales to be the only way gas could become marketable, then there would have been no point in noting that the meaning of marketability "remains an open question." 302 Kan. at 363. Cooper's marketable-means-sale reading of *Fawcett* reaches too far.

Oxy's reading of *Fawcett* is more nuanced than Cooper's but it fares no better. As we noted earlier, Oxy reads *Fawcett* as confirming a long-standing rule that gas sold away from the well may be marketable at the well pre-sale. If so, then Class Gas may have been marketable at the well before processing, allowing Oxy to deduct processing costs from royalty because it incurred those expenses pre-sale. Oxy cites two Kansas

Supreme Court cases that it says support this view: *Sternberger v. Marathon Oil Co.*, 257 Kan. 315, 894 P.2d 788 (1995), and *Coulter*, 296 Kan. 336.

Unlike in *Fawcett*, there was not a market for the gas in *Sternberger* at the well. The gas company couldn't persuade a buyer to build a pipeline that connected to the company's wells. So the company built its own pipeline to transport the raw gas from the wells to a larger pipeline for sale. It deducted a portion of the pipeline construction cost from royalties. A class of royalty owners sued the company to recover those costs. 257 Kan. at 318-20.

The *Sternberger* court held that the gas company could deduct the pipeline-construction costs from royalties. The court summarized Kansas law on the marketable-condition rule: "Once a marketable product is obtained, reasonable costs incurred to transport or enhance the value of the marketable gas may be charged against nonworking interest owners." 257 Kan. at 331. The royalty owners in *Sternberger* offered no evidence that the gas was not already in a marketable condition at the well in its raw form. The pipeline didn't alter the physical quality of the gas—it merely moved the gas from the well to a larger pipeline. The gas was already marketable at the well but there was no buyer there, so the gas could be sold only if transported elsewhere. Thus, the gas company didn't violate the marketable-condition rule by deducting some of the pipeline-construction costs from royalty because those deductions occurred after the gas was already marketable. 257 Kan. at 331-32.

Oxy reads *Sternberger* as holding that gas can be marketable at the well even if no market exists there. If so, and if *Fawcett* didn't overturn *Sternberger*, then Class Gas could have been marketable pre-sale at the well. But even if gas *can* be marketable at the well, how does Oxy know that the Class Gas here *was* marketable at the well? Oxy says the answer lies in *Coulter*.

13

In *Coulter*, the defendant argued that some of the gas in that case was in a marketable condition at the well. Our Supreme Court addressed that argument in dicta—the court was deciding whether a district court erred in affirming a class-action settlement, not the meaning of marketability. The court noted that some gas was used as House Gas, which suggested that "gas at the well site [was] in a marketable condition for household use." 296 Kan. at 365. And some gas was used as Irrigation Gas, which showed that "the gas [was] in marketable condition for use in irrigation systems before it [was] in a condition to enter the interstate transmission pipeline." 296 Kan. at 365. These issues presented "unresolved factual and legal questions" about the marketability of the gas. 296 Kan. at 365. Oxy makes a similar point about determining the marketability of Class Gas.

Oxy observes that Class Gas, like the gas in *Coulter*, may have been marketable at the well. A small amount of gas from Class Wells was never processed—it went straight from the well for use as House, Irrigation, and Field Gas. Oxy says some Class Gas may have been usable at the well for those purposes too, even though Cooper excluded gas from Class Wells used for those purposes from the class definition. Oxy contends that determining whether any Class Gas was usable at the well should preclude certification because it would require a well-by-well analysis.

Taken to its logical conclusion, Oxy's interpretation of *Coulter*, *Sternberger*, and *Fawcett* would substantially erode the marketable-condition rule. Oxy argues that because *some* gas from Class Wells was usable at the well for House, Irrigation, and Field Gas, all Class Gas could have been usable at the well for those purposes. Of course, no Class Gas was used for those purposes—Oxy sent all Class Gas to the Plant for processing and sale in the interstate market. So Oxy must be arguing, as it admitted at oral argument, that all gas from a well is marketable the moment *any* gas from that well is usable for some purpose, even if the gas will not be used for that purpose. Our Supreme Court rejected that view of marketability over a century ago because all gas is usable for

14

some purpose the moment it leaves the ground. See *Ely v. Wichita Natural Gas Co.*, 99 Kan. 236, 246-47, 161 P. 649, 652-53 (1916).

If that were all it took for gas to be considered marketable, then gas companies could deduct every expense incurred after the gas leaves the ground on the theory that some gas is already usable for some purpose. Such a rule would hollow out the marketable-condition rule and render it meaningless. Oxy's reading of *Fawcett*, like Cooper's, reaches too far.

Neither Oxy nor Cooper offers a workable theory of marketability after *Fawcett*. Oxy says Class Gas was in a marketable condition if it was usable at the well for any purpose. But that approach would make all gas marketable at the well because all gas is usable in its raw form for some purpose. Cooper equates marketability with sales, an approach at odds with *Fawcett*. *Fawcett* held that a sale satisfies the duty to market, but it did not hold that a sale was the only way to satisfy that duty. Fortunately, there's a better way to read *Fawcett*.

Through their conduct, the parties in *Fawcett* had defined a market at the well, where the gas company had arranged for a buyer to buy the gas. When those sales occurred, the gas may not have been in a condition suitable to other buyers in other markets downstream. But the gas was in a condition acceptable to a buyer in the only market that mattered—the one created by the parties through their actions. The buyer had some use for the gas and it was evidently already in a condition suitable for that use at the well. 302 Kan. at 364-65. *Fawcett* establishes a simple principle: when parties define a market for gas through their conduct, that gas is marketable when it is in a condition acceptable for that intended market.

The concept of marketability is tied to the market for the gas. As we noted, the quantity of gas available in the Hugoton Field vastly exceeds any market for the use of

15

unprocessed gas for House, Irrigation, or Field Gas. Cooper has defined Class Gas to include *only* the gas intended for the interstate market; the small quantities used for House, Irrigation, or Field Gas are excluded. When the parties have agreed that the gas will be sold in the interstate market, the gas company cannot deduct expenses required to make the gas marketable for that interstate market.

That principle tracks with *Sternberger* and *Coulter* too. The *Sternberger* gas was of a quality capable of being transported in interstate pipelines without processing—it simply had to be moved from one place to another. So the gas company could deduct the costs of building a transportation pipeline to bring the marketable gas to the market intended by the parties. 257 Kan. at 330-32. And in *Coulter*, gas used near the well as House and Irrigation Gas was marketable for those purposes in those markets. 296 Kan. at 365. Those uses, like the well sales in *Fawcett*, were conclusive evidence of marketability.

When applied here, the market-driven definition of marketability easily resolves the parties' claims. Oxy didn't sell any Class Gas at the well; it sold all Class Gas downstream in the interstate market. Until Class Gas was processed, it fell below FERC's minimum-quality standards for transporting gas in interstate pipelines. So Class Gas wasn't in a condition suitable for its intended market until Amoco delivered the processed components (now up to FERC's standards) back to Oxy at the Plant. All royalty deductions from costs incurred before that point violated the marketable-condition rule; deductions after that point did not.

Under this view, the district court didn't need to consider Oxy's list of general marketability factors because none could have affected the marketability of Class Gas. Take Oxy's claim that the district court should have considered whether any Class Gas was usable at the well for House, Irrigation, or Field Gas. Those factors may affect marketability in other cases, but they don't do so in our case when the parties defined the

16

market for Class Gas. Oxy sent all Class Gas to the Plant for processing and sale in the interstate market; no Class Gas was intended for use at the well. That Class Gas may have been in a suitable condition at the well for the House, Irrigation, and Field Gas markets doesn't affect the only relevant inquiry: when was Class Gas suitable for the interstate market where Oxy intended to sell it?

Consider Oxy's argument about HS2 content. A high $H_2S$ content makes gas unmarketable, notes Oxy, so some Class Gas may have been unmarketable if any Class Wells had a high $H_2S$ content. Again, this doesn't matter because all Class Gas was unmarketable until it was in a condition suitable for the market intended by the parties (until it was processed). We don't need to know what the $H_2S$ content of gas from individual Class Wells was because all Class Gas was unmarketable at the well regardless of $H_2S$ content; the dispositive inquiry is the intended market for the gas and that inquiry isn't influenced by $H_2S$ content. Even if $H_2S$ were relevant, its effect on marketability would present a common question because both parties agree that Oxy removed it after gathering Class Gas into a single stream on the way to the Plant for processing. As with the other factors Oxy says affect marketability, we need not consider $H_2S$ content to determine when Class Gas was marketable for interstate sales, the intended market here.

Now that we've established a workable definition of marketability, we can apply it to Cooper's three claims. The first two deductions occurred before the Class Gas was marketable. First, Cooper alleges that Oxy deducted a processing fee for Residue Gas. Oxy incurred that expense before processing. It was a cost incurred to get Class Gas in a condition suitable for interstate sales. So Oxy could not deduct it. Second, Cooper claims that Oxy didn't pay royalty on the 25% NGLs and 50% Crude Helium retained by Amoco as an in-kind processing fee. Like the first deduction, this was a processing expense Oxy incurred to put Class Gas in a condition suitable for interstate sales. So Cooper may also state a claim based on Oxy not paying royalty on the full volume of NGLs and Crude Helium.

17

Cooper's last claim is a different story. That claim says that Oxy violated the marketable-condition rule by paying royalty for Residue Gas on the Index Price rather than on the Occidental Energy's resale price. Residue Gas had been processed when these sales occurred, so the gas was already in a marketable condition. Oxy didn't violate the marketable-condition rule by paying royalty on the Index Price.

To be clear, Oxy may have violated other duties by paying the Index Price. Cooper's class petition alleged that Oxy's Index Price scheme violated two duties other than the marketable-condition rule: the duty of good faith and the duty to obtain the best available price. Those duties are distinct from the marketable-condition rule. *Fawcett*, 302 Kan. at 361, 365-66; see McArthur, *Mineral Royalties, Deductions, and* Fawcett v. Opik: *Continuity and Change in the Revised-But-Still-Standing Kansas Marketable-Product Rule*, 64 U. Kan. L. Rev. 63, 81-85 & n.80 (2015). Our conclusion that Oxy did not violate the marketable-condition rule by paying royalty on the Index Price says nothing about whether that conduct violated these other duties. Cooper's Index Price claims can proceed based on those other duties but not based on the marketable-condition rule.

Let's review what we've established so far. Under *Fawcett*, Class Gas wasn't marketable until it was in a condition suitable for its intended market. All Class Gas was bound for the interstate market and wasn't of a quality suitable for that market until it was processed. So Class Gas was marketable after processing. Two of Cooper's marketable-condition claims allege that Oxy deducted pre-marketability expenses from royalty. Those claims fit *Fawcett*'s definition of marketability and can proceed. But Cooper's third claim—that Oxy paid royalty for Residue Gas on the Index Price—is based on a post-processing deduction after the gas was already marketable. Although this means Cooper doesn't have a claim under the marketable-condition rule for that deduction, Cooper may still state claims that paying the Index Price violated other duties in Class Leases.

18

Before moving on, we need to address one more point on the *Fawcett* issue. At oral argument, Oxy emphasized an unpublished federal district court opinion that discusses *Fawcett*. See *Hitch Enterprises, Inc. v. Oxy USA Inc.*, No. 18-1030-EFM-KGG, 2019 WL 3202257 (D. Kan. 2019) (unpublished opinion), *rev. denied* No. 19-609 (10th Cir. Feb. 10, 2020). We aren't bound by that court's interpretation of Kansas natural-gas law, but we are all trying to get it right. See *Kansas Public Employees Retirement System v. Reimer & Koger Assocs., Inc.*, 262 Kan. 635, 669-70, 941 P.2d 1321 (1997). With that in mind, let's examine *Hitch*.

*Hitch* involved the same facts as our case. The plaintiffs sought certification for royalty underpayment based on deductions they alleged were made before the gas was marketable, and the parties disputed the meaning of marketability based on *Fawcett*. The plaintiffs offered the marketable-means-sale reading of *Fawcett* while Oxy, who was also the defendant in *Hitch*, argued that *Fawcett* didn't alter the long-held rule in Kansas that gas can be marketable at the well. 2019 WL 3202257, at *4.

We agree with much of Judge Eric Melgren's analysis in *Hitch*. Judge Melgren read *Fawcett* (as we do) as holding that a good-faith sale is sufficient but not necessary to satisfy the marketable-condition rule. 2019 WL 3202257, at *5. He also concluded that *Fawcett* left *Sternberger*'s holding—that gas may be marketable at the well before a sale—untouched. 2019 WL 3202257, at *6. We agree with that too.

But our agreement ends there. Judge Melgren denied certification of the plaintiffs' marketable-condition claims based on *Coulter*—he considered House and Irrigation Gas use from some wells as evidence of marketability at the well even though the class definition excluded that gas. 2019 WL 3202257, at *8. Unlike Judge Melgren, we are unconvinced that the usability of a small amount of gas at the well as House or Irrigation Gas affects the marketability of the vastly greater share of the gas that is destined for the

19

interstate market. We've already discussed the problem with accepting that argument—all gas is usable at the well for some purpose. We decline to follow Judge Melgren's analysis because doing so would undermine the marketable-condition rule.

II. *The District Court Did Not Abuse its Discretion When it Found That Cooper's Class Petition Raised Questions of Law and Fact Common to All Class Members.*

Oxy next objects to the district court's commonality finding. Commonality is one of the four requirements that must exist before a trial judge can certify a class action—the plaintiffs' petition must present questions of law or fact common to all class members. K.S.A. 2019 Supp. 60-223(a)(2). That means the proposed class members must state claims that depend on a "common contention that is capable of class-wide resolution, meaning that determination of its validity will resolve an issue that is central to the validity of each of the claims with one answer." *Critchfield Physical Therapy v. The Taranto Group, Inc.*, 293 Kan. 285, 295, 263 P.3d 767 (2011). Put differently, commonality exists if it's "possible for the litigation to generate answers in common for the proposed class to questions raised in common by the class." 293 Kan. at 297.

Oxy raises three issues with the district court's commonality findings. First, Oxy argues that variations in the language in Class Leases preclude a commonality finding. Second, Oxy contends that resolving the factual issues in the case will require Cooper to present individualized evidence. Third, Oxy says that whether it owes interest on repaid Conservation Fees is an individualized question. None of these arguments preclude a commonality finding.

*Disclaimer language in Class Leases doesn't destroy commonality.*

Oxy's first commonality argument is that whether the duty to market exists in Class Leases presents individual questions because language in some leases may disclaim that duty.

20

All gas leases in Kansas contain the implied duty to market. *Fawcett*, 302 Kan. at 366. A gas company may only disclaim that duty with clear and express language to that effect. *Farrar v. Mobil Oil Corp.*, 43 Kan. App. 2d 871, 887-88, 234 P.3d 19 (2010). The express language must authorize the specific deduction taken. See *Gilmore v. Superior Oil Co.*, 192 Kan. 388, 392-93, 388 P.2d 602 (1964).

Oxy doesn't dispute that the duty to market exists in all Class Leases. It instead argues that some Class Leases contain language disclaiming that duty. Because the royalty-clause language in Class Leases varies from one lease form to another, Oxy contends that interpreting the leases to determine whether any disclaim the duty to market raises individual questions that should preclude a commonality finding.

The district court rejected this argument. To disclaim the duty, the court said Oxy needed to show clear and express language authorizing a specific deduction. The court cited an example of a lease Cooper provided that explicitly disclaimed the marketing duty. That lease waived the duty "by using the word 'less' or 'minus' followed by specific naming of the costs that can be deducted." No Class Lease contained such specific language, so the court found that none disclaimed the duty to market. Thus, the court rejected Oxy's claim that whether any leases contained disclaimer language presented individual questions.

On appeal, Oxy focuses on two aspects of the lease language that purportedly disclaim the duty to market: volume and pricing. As to volume, Oxy claims that some individual leases contain language allowing Oxy to pay royalty on less than the full volume of gas produced from a well. Oxy relies on phrases like "gas sold," "gas produced," and "gas marketed" in the leases. Those phrases, Oxy argues, could allow royalty payments on less than the full volume of gas. Oxy also cites variations in lease types (proceeds, market value, and *Waechter*) as having that same effect. Whatever the

21

language, Oxy's point is the same: interpreting Class Leases to determine whether any disclaim the duty to market presents individualized questions that destroy commonality. There are three problems with this argument.

First, any volumetric language disclaiming the duty to market would apply only to Cooper's allegation about retainage fees. That allegation says that Oxy failed to pay royalty on the 25% NGLs and 50% Crude Helium retained by Amoco as an in-kind processing fee. Cooper's other allegations don't turn on the volume of gas on which Oxy paid royalty. So even if Oxy is correct that individual leases may have allowed Oxy to pay royalty on less than the full volume of gas produced from Class Wells, that conclusion would not affect commonality on Cooper's remaining claims.

Second, even if the volume-language issue presented individual questions, it wouldn't preclude class certification. Oxy frames this issue as an objection to the district court's commonality finding, but it doesn't argue that the individual questions posed by volume language in leases would predominate over common questions. As we'll discuss later, Oxy's only predominance argument relates to its statute-of-limitations defense. So even if volume language in leases generates individual questions, the district court didn't abuse its discretion because Oxy has not shown that those questions would predominate.

Third, individual questions wouldn't arise from Oxy's volume argument because the district court correctly found that no Class Leases disclaim the duty to market. We exercise unlimited review over that finding because interpreting a gas lease is a legal question. *Fawcett*, 302 Kan. at 359. As a matter of Kansas law, waiving the duty to market requires express language authorizing a specific deduction. *Farrar*, 43 Kan. App. 2d at 887-88. And as the district court noted, no Class Lease mentions Amoco's in-kind processing fee or authorizes Oxy to subtract that fee from royalty. So the district court properly rejected Oxy's lease-language argument about gas volume.

22

Oxy's other disclaimer argument is based on pricing language in Class Leases. Oxy contends that the district court cannot decide whether paying royalty for Residue Gas on the Index Price violated lease duties classwide because it applies to only proceeds leases. Oxy appears to be arguing that paying royalty on the Index Price could never violate the duty to market under *Waechter* and market-value leases. In other words, Oxy says that the pricing allegation isn't a common question because it only applies to proceeds leases.

Oxy cites no authority directly supporting this argument. The district court noted that it wasn't aware of any Kansas cases interpreting proceeds and market-value leases differently, as Oxy asked it to. On appeal, Oxy cites cases purporting to describe the difference between proceeds and market-value leases. But those cases don't say that market-value or *Waechter* leases authorize payment on the Index Price or that paying that price could never violate the duty to market for those lease types.

The pricing argument has other problems too. Oxy frames it as a commonality issue, not a predominance issue. So even if we found that individual questions arose based on the differences between proceeds leases and other lease types, Oxy has not argued that those questions would predominate over common ones. And because the Index Price claim is only one of Cooper's three claims, success for Oxy on this argument wouldn't affect Cooper's remaining claims—it would simply mean that the Index Price claim presents individual questions that do not predominate over common ones. Nor would it defeat Cooper's Index Price claim because it at best relates to the duty to market. Oxy never argued that the lease-type differences somehow disclaimed the other duties Cooper alleged were violated by paying the Index Price (the duty of good faith and the duty to obtain the best price available).

And both the volume and pricing arguments are common questions even if the district court abused its discretion in rejecting them. Again, the interpretation of gas

23

leases is a question of law. *Fawcett*, 302 Kan. at 359. Whether any leases disclaim the duty to market is a question that the district court can answer classwide. On the volume argument, Oxy says some leases contain language allowing payment on less than the full volume of gas produced from Class Wells. The district court can interpret that language and decide classwide whether that's the case. On the pricing argument, the court can make a single finding on whether market value and *Waechter* leases allow payment on the Index Price. So neither of Oxy's language arguments preclude a commonality finding.

*Cooper's claims can be litigated classwide without individualized evidence.*

Oxy's second commonality argument is that Cooper's claims will require individualized evidence from each class member. Oxy relies on the United States Supreme Court's opinion in *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. ___, 136 S. Ct. 1036, 194 L. Ed. 2d 124 (2016), for this argument.

One issue in *Tyson* centered on the predominance requirement in Rule 23 of the Federal Rules of Civil Procedure. Under Rule 23(b)(3), federal district courts must find that "questions of law or fact common to class members predominate over any questions affecting only individual members." When interpreting that provision, the Court described individual questions as those requiring class members to "'present evidence that varies from member to member.'" 136 S. Ct. at 1045. But with common questions, "'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" 136 S. Ct. at 1045.

The *Tyson* Court applied those definitions to a class action brought by employees at a food-processing plant alleging violations of the Fair Labor Standards Act of 1938. They claimed that Tyson didn't pay them overtime they had a right to receive under the Act for time they spent taking protective gear on and off. The parties agreed that whether that time was compensable work under the Act was a common question. But there were

also questions affecting individual employees. Because the Act only covers employees who work more than 40 hours a week, each employee had to prove that they met the weekly hours requirement. Doing so proved difficult, however, because Tyson didn't keep records of time spent taking the protective gear on and off. Tyson argued that each individual employee would have to prove the amount of weekly time spent putting on and taking off the gear. According to Tyson, that inquiry would predominate over questions common to the class.

Without employer records, the employees relied on statistical evidence to show that they met the hours requirements. They provided a study estimating the average time an employee spent taking the protective gear on and off. The employees added that estimate to each class member's hours to determine whether class members met the 40-hours threshold. Because the employees' study provided a way to determine hours classwide, the Court held that Rule 23's predominance requirement was satisfied. 136 S. Ct. at 1048-49.

Oxy says that Cooper's claims don't meet *Tyson*'s definition of commonality. As Oxy sees it, *Tyson* focuses the individual-versus-common question inquiry on whether all class members will present identical evidence. For Oxy, the factual issues in Cooper's petition present individual questions because individual records exist for each Class Well. If each class member sued individually, Oxy says they would have to rely on evidence specific to their individual wells. And even if Cooper can present expert testimony about all class members, the expert would have to analyze each individual lease and evidence particular to each individual well. Thus, Oxy says *Tyson* supports its opposition to certification.

We disagree because Cooper's claims fit *Tyson*'s definition of commonality. To establish that Oxy breached duties in Class Leases, Cooper will present the same evidence for each class member because the claims center on Oxy's conduct. Cooper will

25

rely on Oxy's documents showing the expenses it incurred putting Class Gas in a marketable condition, the royalty deductions it took, and the agreements it entered with Occidental Energy and Amoco. None of that information will vary for any individual class member—each member would put on the same evidence if they brought their claims individually.

Cooper's three allegations highlight this point. Cooper first alleges that Oxy's affiliate-pricing scheme violates implied lease duties. To prove that claim, Cooper relies on Oxy's marketing agreement with Occidental Energy and records comparing the resale price with the Index Price. Oxy doesn't dispute that it paid royalty for Residue Gas to all class members on the Index Price, so litigating the affiliate-price allegation will not require individualized evidence.

Nor will litigating Cooper's second allegation. Cooper says Oxy didn't pay royalty on the 25% of NGLs and 50% of Crude Helium retained by Amoco as an in-kind processing fee. That fee was established in Oxy's contract with Amoco and confirmed by Amoco's plant statements. Cooper's expert obtained the list of Class Wells subject to that fee by examining Oxy's payment data. Without relying on evidence from any individual class member, Cooper can show that Oxy processed all Class Gas at the Plant and that all gas Oxy sent to the Plant was subject to the in-kind fee. Like the first allegation, Cooper can present classwide evidence that Oxy didn't pay royalty on the gas retained by Amoco.

The same goes for Cooper's third allegation. That allegation is about processing fees for Residue Gas and proving it will require Cooper to show that Oxy deducted those fees from all Class Gas. Cooper can do so with Oxy's payment data. It needs no evidence from individual class members. For all three allegations, then, common evidence can be presented for all class members—expert testimony and documents from Oxy and third-parties.

26

Oxy also argues that class members will have to present individual evidence to prove damages. But Cooper presented enough evidence for the district court to find that Cooper could calculate damages classwide. Cooper's expert showed the ability to do so using Oxy's payment data. With that data, Cooper's expert calculated classwide damages for each month during the Class Period. Other courts have upheld similar damages calculations when challenged at the certification stage. See *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 798 (10th Cir. 2019). We follow their lead and do the same here. The district court did not err in finding that Cooper's claims were capable of classwide resolution without individual evidence from class members.

*The dispute over interest on repaid Conservation Fees is a common question.*

Oxy's final commonality argument is that the district court abused its discretion when it found that the parties' dispute over interest on repaid Conservation Fees was a common question affecting all class members. The Kansas Corporation Commission assesses a Conservation Fee on first purchasers of gas produced in Kansas. See K.S.A. 2018 Supp. 55-176; K.A.R. 82-3-307(a). The Kansas Supreme Court held in 2011 that gas companies could not deduct Conservation Fees from royalty payments. *Hockett v. The Trees Oil Co.*, 292 Kan. 213, Syl. ¶¶ 4-5, 251 P.3d 65 (2011). After *Hockett*, Oxy refunded class members Fees it had been deducting from royalties. But Oxy didn't pay any interest on refunded Fees.

The parties dispute what statute applies to determine whether and at what rate class members should receive interest on refunded Conservation Fees. Cooper maintains that the general interest-rate statute applies. Under that statute, Oxy would owe each class member 10% annual interest on repaid Fees. K.S.A. 16-201. Oxy counters that specific statutes involving interest on oil and gas payments should apply. K.S.A. 55-1614; K.S.A. 55-1615. Under those statutes, interest does not accrue on "[e]xcluded payments" (payments totaling less than $100 annually). K.S.A. 55-1614(i). If Oxy deducted less than

27

$100 in Conservation Fees from a class member's royalty payments in a given year, then that plaintiff wouldn't be entitled to any interest on repaid Conservation Fees for that year. Oxy reasons that Cooper's Conservation Fee claim presents individual questions because the district court would have to determine whether the excluded-payments exception applied to each class member by calculating the amount of annual Conservation Fees deducted from royalties during each year of the Class Period.

Oxy cites two unpublished federal cases supporting its position. In both cases, Judge Melgren found that Oxy's statutes should apply because they were more specific. See *Hitch*, 2019 WL 3202257, at *9-11; *Roderick v. XTO Energy, Inc.*, No. 08-1330-EFM-GEB, 2016 WL 4039641, at *10-12 (D. Kan. 2016) (unpublished opinion).

We need not decide which statute applies. We agree with the district court that whether Oxy owes interest on repaid Conservation Fees, and if so, how much, is a question common to all class members. The district court declined to answer that question at the certification stage because the parties had not fully briefed it. Oxy will get the chance to argue its position after this appeal because Cooper has included the Conservation Fees issue in the pending summary-judgment motion. The district court can weigh in on the Conservation Fees issue when it decides that motion after the parties have developed their positions more fully. The district court did not err in its decision that the Conservation Fees issue presents a common question supporting class certification, and that's all we need to decide now.

The district court can always reevaluate certification if it later finds that Oxy is right about the interest-rate statute that applies. If determining whether each class member received more than $100 in each class year presents individualized questions, then the district court can consider whether those questions predominate over common ones. If so, it could amend the certification order as needed. See K.S.A. 2019 Supp. 60-223(c)(1)(C). Of course, if the district court finds that K.S.A. 16-201 applies, then no

28

individual questions would arise because all class members would receive 10% annual interest on repaid Fees.

III. *The District Court Did Not Abuse Its Discretion When It Found That Common Questions Predominate Over Issues Involving Oxy's Statute-of-Limitations Defense.*

Oxy next argues that its statute-of-limitations defense raises individual questions that predominate over common questions.

For a class action certified under subsection (b)(3), as the district court did here, it must find that "questions of law or fact common to class members predominate over any questions affecting only individual members." K.S.A. 2019 Supp. 60-223(b)(3). Predominance is a more demanding standard than commonality. *Farrar*, 43 Kan. App. 2d at 875-76. It requires that "common questions must be more significant than individual ones, but it does not require that *all* issues in the suit have common answers and common evidence." *O'Brien v. Leegin Creative Leather Prod., Inc.*, No. 108,988, 2014 WL 1362657, at *10 (Kan. App. 2014) (unpublished opinion). Instead, predominance tests whether the class is "sufficiently *cohesive* to warrant adjudication by representation." *Farrar*, 43 Kan. App. 2d at 875.

We first examine the district court's claim that it wasn't required to consider Oxy's statute-of-limitations defense when making a predominance finding. The district court found that when deciding predominance, it considers only evidence relevant to the plaintiff's prima facie case, not to affirmative defenses like statute of limitations. It cited several authorities supporting that view. It quoted *Tyson*'s statement that a district court can certify a (b)(3) class action "'even though other important matters will have to be tried separately, such as . . . affirmative defenses peculiar to some individual class members.'" 136 S. Ct. at 1045. And it cited a treatise on class actions under Rule 23. 2 Rubenstein, Newberg on Class Actions, § 4:57 (5th ed. 2012) ("Statute of limitations

29

defenses—like damage calculations, affirmative defenses, and counterclaims—rarely defeat class certification.").

We disagree with the district court on this point. Under Kansas law, the district court was free to consider evidence relevant to Oxy's statute-of-limitations defense when evaluating predominance. Nothing in the text of K.S.A. 2019 Supp. 60-223(b)(3) precludes consideration of affirmative defenses when deciding predominance. And no Kansas court has ever interpreted that provision as barring consideration of affirmative defenses. Nor do the sources cited by the district court support such a requirement. Those sources simply say that affirmative defenses rarely defeat certification because any individual issues arising from them "can be resolved during the damage phase of the case and need not preclude certification of liability issues." 2 Rubenstein, Newberg on Class Actions, § 4:57 (5th ed. 2012). So the district court should have considered evidence about affirmative defenses when deciding predominance.

Actually, though, it did. Although it said it wasn't required to consider affirmative defenses, the district did consider whether Oxy's statute-of-limitations defense presented individual questions, and if so, whether those questions predominated over common ones. The court found that Oxy's defense was a common question because it could be resolved classwide. We must determine whether that was an abuse of discretion; we begin by taking a closer look at Oxy's defense.

Oxy argues that the statute of limitations bars Cooper's claims. The limitations period on those claims is five years. K.S.A. 60-511. Cooper states claims for royalty deductions taken from July 1, 2007, to April 30, 2014. Cooper didn't sue until 2017, so the statute of limitations may bar claims from 2007 to 2012. But Cooper can defeat that defense by proving equitable estoppel. In Oxy's view, proving equitable estoppel would predominate over any common questions because it would require individual evidence and testimony from each class member.

30

Oxy cites four federal cases in support of this argument, but we do not find them persuasive.

The first case denied certification under Rule 23 because "[a]pplication of the statute of limitations and the discovery rule involve[d] the consideration of facts unique to each class member." *Doll v. Chicago Title Ins. Co.*, 246 F.R.D. 683, 687 (D. Kan. 2007). When the limitations period began to run in *Doll* turned on when class members discovered their claims. The discovery inquiry involved detailed fact-finding about whether and when each class member was on notice of the claims.

Unlike the unique and individualized proof required in *Doll*, Cooper has presented common classwide evidence on equitable estoppel. Cooper's expert alleges that Oxy's contracts with Occidental Energy and the Processor are "confidential documents [that] royalty owners cannot access." From that evidence, Cooper alleges that no class member could have known that Oxy was deducting certain expenses because that information was not publicly available and members had no reason to ask about it. For that reason, this case is distinguishable from *Doll*.

The next two cases Oxy cites involved decertification motions. In both cases, the district court certified the class and the defendant later asked the court to decertify based on a statute-of-limitations defense predominating over individual questions. *Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977, 1012 (D. Kan. 2018); *O'Connor v. Boeing North American, Inc.*, 197 F.R.D. 404, 413-14 (C.D. Cal. 2000). The *O'Connor* court, for example, noted that when it first certified the class, the plaintiffs' allegations "supported the inference that no one could reasonably have learned of [d]efendants' alleged" conduct until after the limitations period ran. 197 F.R.D. at 414. Cooper has similarly alleged that no class member could have known about Oxy's deductions because they were confidential. So Cooper may be able to prove equitable estoppel classwide. And if the

31

district court later determines that Cooper cannot do so, then it can amend or decertify the class as necessary. See *Chamberlain v. Farm Bureau Mut. Ins. Co.*, 36 Kan. App. 2d 163, 177-78, 137 P.3d 1081 (2006).

Oxy's last case involved a class action filed by landowners against the operator of a chemical plant. The landowners alleged that contamination caused by the plant decreased their property values. *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 637-38 (S.D. Ala. 2005). The definition for one of the subclasses in the case included hundreds of landowners within a 20- to 25-kilometer area around the chemical plant. The court listed nine factors it would have to consider to determine whether each landowner could defeat a statute-of-limitations defense. That painstaking process precluded a predominance finding. 231 F.R.D. at 674-75.

The painstaking fact-finding process described in *LaBauve* is unlike the simple statute-of-limitations inquiry here. Like the class in *LaBauve*, Cooper's class includes hundreds of members. Yet determining whether equitable estoppel applies to each of Cooper's class members will not require a multi-factor, individualized analysis. Cooper alleges that Oxy concealed the deductions it took. If that's true, then no class member could have timely discovered their claims. Like the rest of the federal cases Oxy cites, *LaBauve* is distinguishable.

Oxy cited one more case in a letter submitted after briefing under Supreme Court Rule 6.09 (2020 Kan. S. Ct. R. 39), *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619 (D.C. Cir. 2019). Like the other cases Oxy cited, *Rail Freight* is distinguishable.

In *Rail Freight*, a class of 16,065 shipping companies sued under federal anti-trust laws for damages caused by a price-fixing conspiracy among several freight railroads. Proving these federal claims required each shipping company to prove both an injury to

its business and a causal link between that injury and the price-fixing conspiracy. Without common proof of these elements, the shipping companies would not be able to meet Rule 23's predominance requirement. So they needed a way to prove classwide that the price-fixing conspiracy injured each company.

To do so, they relied on an expert's regression model that provided an estimated damage amount for each company. The model controlled for seven variables used to calculate railroad prices, attempting "to isolate price increases attributable to the alleged conspiracy." 934 F.3d at 621. But the model returned thousands of false positives. Although the companies claimed that they were all harmed by the price-fixing conspiracy, the model refuted that claim. It said that 2,037 (12.7%) of the companies suffered no losses. So the district court would have had to determine individually whether those 2,037 companies were injured by the conspiracy. That individualized inquiry for thousands of companies would predominate over common questions, so the court affirmed the denial of class certification. 934 F.3d at 624-25.

Oxy cites *Rail Freight* as making clear "that even where the plaintiff intends to present class-wide evidence through an expert, the plaintiff must show that common issues predominate over individual issues." True enough, but the district court correctly found that the statute-of-limitations defense presented a common, classwide question. Unlike the *Rail Freight* plaintiffs, Cooper doesn't rely on statistical models to show liability. Cooper relies instead on Oxy's data showing the expenses it deducted from royalties. Oxy admits that it took those deductions but says they didn't violate any implied duties in Class Leases. But if they do, then every class member suffered an injury. There's no comparable problem in determining liability classwide; there's no potential that *any* class members were uninjured if Cooper wins its arguments about marketability. And the district court found that to the extent litigating the equitable estoppel issue presented individual questions, those questions would not predominate.

33

The district court correctly found that Cooper could litigate the statute-of-limitations defense classwide with evidence from its expert that no class member could have known about the deductions. That evidence supports an inference of equitable estoppel classwide. So the district court did not abuse its discretion in finding that Oxy's defense was a common question.

Even if the statute-of-limitations defense had presented individual questions, the district court also found that those questions would not predominate. That finding was supported by the court's observation that in *Fawcett*, a statute-of-limitations defense had been tried classwide on remand. Oxy says the district court should not have relied on *Fawcett* because there may have been circumstances there that allowed classwide resolution of the limitations defense that are not present here. But Oxy doesn't say what those circumstances are; we need not speculate about what they might be. The district court didn't abuse its discretion in finding that any individual questions posed by Oxy's limitations defense would not predominate over common questions.

Oxy raised one last point on predominance in its reply brief. Cooper's brief argued that even if the statute of limitations bars several years of recovery for class members, it doesn't bar claims within the limitations period. Oxy frames that argument as Cooper sacrificing the bulk of class members' potential claims (because most are outside the limitations period) to obtain certification. Oxy says this raises questions about the adequacy of Cooper as a class representative. Adequacy of representation is one of the four prerequisite requirements for class certification. K.S.A. 2019 Supp. 60-223(a)(4). Oxy didn't argue adequacy of representation in its original brief; it raised the issue for the first time in the reply brief. Cooper had no opportunity to respond, so we need not consider Ox's adequacy argument. *Sierra Club v. Mosier*, 305 Kan. 1090, Syl. ¶ 19, 391 P.3d 667 (2017); see Supreme Court Rule 6.05 (2020 Kan. S. Ct. R. 36).

34

IV. *The District Court Rigorously Analyzed the Requirements for Class Certification.*

The last issue Oxy raises relates to the district court's treatment of expert testimony. Oxy argues that the district court failed to rigorously analyze the statutory requirements for class certification because it ignored problems with Cooper's expert report and failed to resolve Oxy's motion to strike that report before certifying the class.

The district court abuses its discretion when it certifies a class action without rigorously analyzing the statutory requirements. *Farrar*, 43 Kan. App. 2d 871, Syl. ¶¶ 3-4. But a rigorous analysis doesn't mean the district court must "conduct a mini-trial with extensive fact-finding before certifying . . . a class." *Critchfield*, 293 Kan. at 293. It simply means that the court must find that the plaintiff has enough evidence to conclude that certification is appropriate given the statutory requirements. *Critchfield*, 293 Kan. at 295. Oxy argues that the district court failed to conduct a rigorous analysis in two ways, both of which relate to its treatment of expert testimony.

First, Oxy claims that the district court didn't rigorously analyze the certification requirements because it ignored several issues Oxy raised with Cooper's expert. Oxy raised those issues in a motion to strike included within its motion opposing certification. The motion to strike said that Cooper's expert ignored important differences in lease language when calculating damages and that he failed to account for factors affecting the marketability of Class Gas. Oxy repeats these arguments on appeal and says that the district court should have addressed them. According to Oxy, these flaws made the expert's classwide-damage calculations unreliable.

Oxy's arguments against Cooper's expert go to the merits, not certification. Given our earlier conclusion that Class Gas was unmarketable until it was processed, Cooper's expert couldn't have erred in failing to account for the marketability factors cited by Oxy (because they are the same pre-processing factors we rejected earlier). As for Oxy's other

criticisms, Cooper and Oxy both presented experts who analyzed the parties' claims and calculated potential damages. The district court didn't conclusively adopt either party's expert testimony; it merely found that Cooper's expert showed an ability to calculate classwide damages and address other issues common to all class members. If the case goes to trial, the fact-finder may accept Oxy's criticisms of Cooper's expert. But at the certification stage, the district court needed only to find that Cooper had presented enough evidence to satisfy the statutory requirements. The district court did not abuse its discretion in finding that Cooper had done so.

Second, Oxy argues that the district court didn't conduct a rigorous analysis because it certified the class without ruling on Oxy's pending motion to strike Cooper's expert.

Cooper says the court didn't have to rule on the motion because Oxy didn't argue it at the hearing on the certification motion. The gist of Cooper's argument is that Oxy invited any error because it agreed that the district court should wait to rule on the expert motion until after certification. But the transcript from the hearing makes quick work of this argument. Oxy's counsel explicitly asked the district court at the hearing to consider the expert motion along with the certification motion. So Oxy didn't invite the district court to delay ruling on its motion until after certification.

Even so, the district court implicitly ruled on Oxy's motion by making detailed findings in the certification order addressing the substance of the motion. For example, the motion claimed that Cooper's expert incorrectly assumed that Kansas law requires Oxy to pay royalties based on the best available price. The certification order directly addressed that point with citations to Oxy's motion. The court found that no Class Lease contained language disclaiming the best-price duty and that whether Oxy breached that duty was a common question. The court also addressed Oxy's claim that Cooper's expert wrongly assumed the point at which gas becomes marketable. It found that none of Oxy's

36

general marketability factors affected the marketability of Class Gas. The district court implicitly denied Oxy's motion by responding to the substantive claims in that motion in the certification order.

We don't think that the district court would have committed error by not ruling—implicitly or explicitly—on Oxy's motion. Oxy argues for a procedural rule that the district court had to rule on the motion to strike before certifying the class. Yet the statute for class certification, K.S.A. 2019 Supp. 60-223, doesn't impose such a requirement. Nor do the cases interpreting that section. What those cases do tell us is that the district court need not "conduct a mini-trial with extensive fact-finding before certifying a class." *Critchfield*, 293 Kan. 285, Syl. ¶ 2.

In short, the district court conducted a rigorous analysis when it certified Cooper's class action. The court issued more than 20 pages of findings and showed that it had thoughtfully considered the parties' arguments. The court did not have to oversee a mini-trial on the battle-of-the-experts at this stage; it merely had to determine that Cooper presented enough evidence to satisfy the class-action requirements. Because the court did so, it did not abuse its discretion.

We affirm the district court's judgment.